HATCO CORPORATION, Plaintiff,

v.

W.R. GRACE & CO.—CONN., Defendant, Third–Party Plaintiff,

v.

ALLSTATE INSURANCE CO., et al., Third–Party Defendants.

Civ. A. No. 89–1031.

United States District Court, D. New Jersey.

March 1, 1994.

Supplemental Opinion April 29, 1994.

Aubrey M. Daniel, III, Paul Mogin, Evan Roth, Eric M. Braun, Dane Butswinkas, Williams & Connolly, Washington, DC, for plaintiff.

Thomas H. Sear, Randy Paar, Elizabeth A. Sherwin, Erik T. Sorensen, Paul N. Farquharson, Anderson, Kill, Olick & Oshinsky, New York City, for defendant-third party plaintiff Grace.

## Table of Contents

| | | Page |
|---|---|---|
| I. | FINDINGS OF FACT | 939 |
| | A. The Parties | 939 |
| | B. The Property | 939 |
| | C. Plant History | 939 |
| | 1. Ownership | 939 |
| | 2. Manufacturing | 940 |
| | 3. Waste Treatment | 941 |
| | 4. Location of Site Facilities | 942 |
| | D. Contamination Overview | 942 |
| | 1. Sampling | 942 |
| | 2. Contaminants | 943 |
| | E. Remediation by Hatco | 943 |
| | 1. DEP Involvement at the Fords Property | 944 |
| | 2. The PA Disposal Area | 944 |
| | a. The Manufacturing of Phthalic Anhydride | 944 |
| | b. Disposal of the PA and Naphthalene Still Bottoms | 945 |
| | c. Investigation, Sampling and Testing of the PA Disposal Area | 946 |
| | d. The Decision to Excavate | 947 |
| | (1) Assessment | 947 |
| | (2) The Need for a Response Action | 948 |
| | (3) The Potential Sale to Exxon | 949 |

936

         (4)  The EPA Land Ban of K024 .......................... 949
         (5)  Alternatives and Costs ................................ 950
         (6)  The Excavation...................................... 950
    3.  Project 50 ................................................ 951
      a.  Television Camera Inspection of Hatco's Sewer System ....... 952
      b.  The Ester I and West Road Sewer Lines ................... 953
      c.  Isolation and Capping of the Lagoons ...................... 953
      d.  Elimination of Ester II Swale Discharge..................... 954
      e.  Ester I Tank Farm Construction Projects ................... 954
    4.  Project 51 ................................................ 955
  F.  Response Costs Incurred by Hatco ............................... 956
    1.  Cleanup of the PA Disposal Area........................... 956
    2.  Project 50 ................................................ 956
    3.  Project 51 ................................................ 956
    4.  Groundwater Monitoring: 1982–86.......................... 957
    5.  Laboratory Work: 1991–93 ................................ 957
    6.  Disposal of PCB–Contaminated Waste ...................... 957
    7.  Cleanup of M Tanks...................................... 957
    8.  Management Time and Attorneys' Fees ..................... 958
    9.  DRAI Fees ............................................... 958

II.  CONCLUSIONS OF LAW ......................................... 960

  A.  Count I—Hatco's Claim Under CERCLA
    1.  Elements of Hatco's Prima Facie Case ......................... 960
    2.  The NCP .................................................. 960
      a.  Removal or Remedial Actions? ............................. 961
      b.  The PA Response Action .................................. 963
        (1)  Motives and Intent .................................... 963
        (2)  Questions of Compliance—1985 NCP Removal Provisions 964
          (A)  Propriety of a Removal Action—Assessment .......... 964
          (B)  Alternatives and Costs .............................. 966
          (C)  Community Relations, ARARs and Cost Documentation 968
      c.  Projects 50 and 51........................................ 969
    3.  Necessary Response Costs .................................. 970

  B.  Count Four—Hatco's Claim for Contribution Under the New Jersey Spill
    Act ....................................................... 972

  C.  Allocation of Response Costs .................................... 972
    1.  PA Response Action ........................................ 973
    2.  Project 50 ................................................ 973
      a.  Replacement of Ester I and West Road Sewer Lines ........ 974
      b.  Television Camera Inspection of the Sewer System ........... 974
      c.  Isolation and Capping of the Lagoons ...................... 975
      d.  Diverting Ester II Swale Discharge from the East Lagoon to the
        EPT Plant ............................................. 975
      e.  Ester I Tank Farm Construction Projects ................... 975
    3.  Project 51 ................................................ 975
    4.  Groundwater Monitoring: 1982–86.......................... 976
    5.  Laboratory Work: 1991–93 ................................ 976
    6.  Disposal of PCB–Contaminated Waste ...................... 977
    7.  Cleanup of M Tanks...................................... 978
    8.  Management Time and Attorneys' Fees ..................... 978
    9.  DRAI Fees ............................................... 978

  D.  Prejudgment Interest........................................... 979

  E.  Punitive Damages .............................................. 980

III.  RETAINING JURISDICTION ....................................... 980

WOLIN, District Judge.

## INTRODUCTION

The dawn of reckoning has arrived. After nearly five years, six opinions,[1] two trials, reams of trial and deposition testimony, and thousands of exhibits, the Court enters the long awaited damages phase in this complex environmental litigation arising from prolonged hazardous waste discharges at an industrial property located in Fords, New Jersey (the "Fords property"). While this Opinion undertakes the first allocation of damages between plaintiff Hatco Corporation ("Hatco"), the current owner of the Fords property, and W.R. Grace & Co.—Conn. ("Grace"), the previous owner, it also marks a definitive point of closure—at least with respect to this forum—in the ongoing legal contest between Hatco and Grace, each seeking to devolve upon the other the costs of remediating this property.

Previous opinions issued by this Court have touched upon the cruel dilemma of modern society—the insatiable quest for corporate growth and its economic rewards, paradoxically purchased at the expense of ecological and human resources. The Court will not revisit that theme today, but it is not forgotten, upon reaching this watershed in the struggle to place responsibility where responsibility is due for the contamination and cleanup of the Fords property.

For the past decade, the property has been the subject of extensive scrutiny and study by New Jersey's Department of Environmental Protection ("DEP") and private environmental consultants, generating an enormous wealth of historical information about the facility's thirty-three year operation and its current environmental condition. Because of this vast historical record, past speculative financial exposure gives way to the sobering receipt of the first invoice.

To date, Hatco has expended over ten million dollars responding to the environmental conditions at the Fords property. If nothing else, this action has proven that the cleanup of an industrial site may not only be expensive, but may involve a range of actors, from state regulatory agents to private consultants, engaging in a variety of activities, which may include negotiating settlements, testing for contamination, contracting with disposal companies, excavating materials and replacing or cleaning contaminated equipment. The list of potentially required tasks is endless, so too are the potential costs.

Hatco has undertaken four different remediation activities since its purchase of the property. Instituted by Hatco in early 1991, and completed by end of that summer, Project 50 involved various construction projects designed to limit the migration of contaminants via the flow of surface water over certain areas of the property. Project 51, which is ongoing, involves activities taken in response to groundwater contamination found at specific locations at the site. Hatco also undertook the offsite disposal of certain contaminated liquids from the facility. And last, but significantly, one of these four projects involved a distinct area of the Fords property which Grace had used as a depository for the byproducts of its phthalic anhydride manufacturing processes. The predominant byproduct has been designated as a hazardous waste by the United States Environmental Protection Agency ("EPA"). In August 1988, Hatco excavated the area (the "PA Disposal Area") and disposed of the materials at an offsite landfill.

Hatco now seeks to recover from Grace the expenses associated with these four projects, in addition to the costs incurred as a result of DEP's oversight of the remedial efforts at the property. In pursuit of its response costs, Hatco has invoked both federal and state statutory mechanisms for recovery: the Comprehensive Environmental

---

1. Three of these opinions were published under the following citations: (1) *Hatco Corp. v. W.R. Grace & Co.—Conn. ("Hatco I")*, 801 F.Supp. 1309 (D.N.J.1992); (2) *Hatco Corp. v. W.R. Grace & Co.—Conn. ("Hatco II")*, 801 F.Supp. 1334 (D.N.J.1992); (3) *Hatco Corp. v. W.R. Grace & Co.—Conn. ("Hatco III")*, 836 F.Supp. 1049 (D.N.J.1993).

Response and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.;* and the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:23–11, *et seq.* To recover under CERCLA, Hatco must prove that the remediation projects were selected and implemented in accordance with the National Contingency Plan ("NCP"), a rule promulgated by EPA which provides a framework for responding to the release of hazardous substances into the environment.

Grace challenges the propriety of awarding to Hatco any costs arising from Projects 50 and 51 and the excavation of the PA Disposal Area, alleging that Hatco failed to comply with NCP requirements. With respect to Projects 50 and 51 and the question of NCP compliance, the Court relies solely on the record created in the *Hatco III* trial and additional stipulations submitted after this trial.

Grace also vigorously opposes Hatco's recovery of response costs associated with the PA Disposal Area, which exceed five million dollars. Grace's objection is grounded upon two allegations. First, Hatco never considered the NCP prior to undertaking the excavation. Second, Hatco excavated the area only to meet a precondition of an agreement to sell the property, not to remedy any significant threat to human health or the environment. In September of 1993, the Court conducted a bench trial to determine whether Hatco had complied with the NCP when implementing the excavation of the PA Disposal Area.

To assist the Court with this decision, Hatco presented one expert witness, Mr. Kenneth Siet, currently associated with Dan Raviv Associates Incorporated ("DRAI"), the environmental consulting firm hired by Hatco to address the problems that spawned this litigation. Prior to his position with DRAI, Mr. Siet worked at DEP for approximately eight years, overseeing the remediation of over eighty sites, a few of which involved the implementation of NCP-related tasks. Based upon a review of the documentary evidence, Mr. Siet offered the opinion that Hatco had substantially complied with the NCP in excavating the PA Disposal Area.

Grace, in opposition, presented two expert witnesses, Dr. James Mercer and Dr. L. Anthony Wolfskill. Dr. Mercer is the president and principal hydrogeologist at Geo-Trans, Inc., an environmental consulting firm. Based upon a review of the documentary evidence and the benefit of hindsight, Dr. Mercer concluded that the PA Disposal Area did pose a threat to the environment in 1988. In his view, however, Hatco inadequately investigated the area and thus could not have discovered any threat to the environment prior to the excavation. He concluded that Hatco had not substantially complied with the NCP.

Dr. Wolfskill is associated with Woodward–Clyde Consultants, a consulting firm specializing in civil and environmental engineering and science. Based upon documentary evidence, he testified on the technical issues considered by Hatco prior to the excavation. It was his opinion that Hatco failed to weigh adequately the alternatives to excavation and hence had not substantially complied with the NCP.

Subsequent to the trial, the parties submitted proposed findings of fact on the issue of NCP compliance for Projects 50 and 51 and for the excavation of the PA Disposal Area. In addition, the parties filed numerous stipulations in an effort to assess the response costs for which Hatco now seeks recovery.

In addressing the question of causation in *Hatco III*, the Court lamented the difficulties inherent in assigning liability in a complex environmental case, likening the task to crossing a mine field with a faded map as a guide. The Court has survived that journey and now ventures into a different, but no less daunting, mine field. Whether it be causation, cost allocation or NCP compliance, the arenas of environmental legislation, remediation and jurisprudence are fraught with impediments to exacting precision and defy patent standards of simple application. In this case-by-case world of environmental litigation, the Court will apply the dictates of common sense and reality in assessing responsibility and allocating the sizable costs for the remediation of the environmentally affected sites. With this goal in mind, the Court today converts legal and scientific con-

cepts into the currency of the marketplace— real dollars. Through findings of fact and conclusions of law, the Court fulfills the warrant for its existence.

## I. FINDINGS OF FACT[2]

### A. The Parties

1.* Plaintiff Hatco Corporation ("Hatco"), a New Jersey corporation, is· the present owner of the property at issue in this case.

2.* Defendant W.R. Grace & Co.—Conn. ("Grace"), a Connecticut corporation, is the prior owner of the property at issue in this case and a wholly owned subsidiary of W.R. Grace & Company, a New York Corporation. (Stipulation No. 46)[3]

### B. The Property

3.* The property at issue in this litigation is an eighty-acre parcel of land located in Fords, New Jersey (the "Fords property"). (Stipulation No. 1) The Fords Property is situated approximately 4,000 feet from the Raritan River, (47:19 (Raviv)),[4] and is bounded to the north by King George Post Road, to the east by Sling Tail Creek, to the south by Industrial Highway and to the west by Crows Mill Creek. (DE002)

4.* The slope of the Hatco site is generally south-southwest. Groundwater flow and surface drainage events follow the site's surface topography, which is high in the center (34:13 (Raviv)), and run toward and are collected by Sling Tail Brook and Crows Mill Creek. (Stipulation No. 9)

5.* The soil profile of the Hatco site, moving from the surface to the underlying soils, changes from fill with clay to light to dark

gray clay to clay mixed with sand to clay to poorly sorted sand and finally to dark gray clay. (357:6 (Raviv)) The natural dark clay layer is significant because its lower permeability prevents the movement of contamination. (357:21 (Raviv))

### C. Plant History

#### ·1. Ownership

6.* In the early 1950s, a brick and tile manufacturer used the Fords property as a clay pit. (Stipulation No. 2)

7.* In approximately 1954, Mr. William Hackman ("Hackman"), the owner of the Hatco Chemical Company, purchased the Fords property and relocated his chemical manufacturing business there. (Stipulation No. 3) The Hatco Chemical Company previously was located in Kearny, New Jersey, where it manufactured plasticizers, synthetic lubricants and napalm. (Stipulation No. 4)

8.* From approximately 1954 until 1959, Hackman owned and operated the Hatco Chemical Company on the Fords property (the "Fords facility"). (Stipulation No. 5)

9.* In June 1959, Grace purchased the Hatco Chemical Company from Hackman for approximately $5.4 million. (E10 at WRG 06767) The business became a division of Grace known as the Hatco Chemical Division.[5] (Stipulation No. 6)

10.* Hackman remained at the helm of the Hatco Chemical Division until 1962 when Mr. Alex Kaufman ("Kaufman") became president of the Hatco Chemical Division. Kaufman held this position until his resignation in 1978. (Stipulation No. 85)

---

**2.** To place the instant issues in historical context, the Court adopts and incorporates the text of paragraphs 1–56 of *Hatco III's* findings of fact. Therefore, the below findings of fact, paragraphs 1–56, are identical in numbering and in text to paragraphs 1–56 of *Hatco III's* findings of fact. For reference purposes, these paragraphs are set off by the placement of an asterisk after the paragraph number (e.g., "1*").

**3.** The parties submitted eleven sets of stipulations during the *Hatco III* trial and an additional ten stipulations for this trial. The paragraphs of the first two stipulations are numbered consecutively and will be referenced by the paragraph numbers. The remaining stipulations will be cit-

ed by witness name and paragraph, except for stipulation totalling Hatco's response costs, hereinafter "Damages Stipulation." A glossary of non-testifying witnesses appears in Appendix I.

**4.** Due to the frequency with which the trial transcript is cited, the pages and lines of the relevant testimony and the identity of the witness will be reported as follows: (page:line (surname of witness)).

**5.** To avoid unnecessary confusion, the Court will refer to the defendant as "Grace" or the "Hatco Chemical Division" and to the plaintiff as "Hatco."

11.* From 1959 until August 21, 1978, Grace owned and operated the Fords facility. On August 21, 1978, the Farben and Fuss Corporations purchased the Fords facility from Grace for $9.6 million. (E671 at H037006; 2032:18–2033:6 (Kaufman)) The Fuss Corporation ("Fuss") purchased the "Chemical Realty" of the Hatco Chemical Division. The Farben Corporation ("Farben") purchased the "Chemical Assets other than the Chemical Realty" of the Hatco Chemical Division. (Stipulation No. 7) Kaufman held controlling interests in both Fuss and Farben. (1967:6–9, 2032:18–21 (Kaufman))

12.* On September 1, 1978, Farben changed its name to the Hatco Chemical Corporation. On September 30, 1978, Fuss merged into the Hatco Chemical Corporation. On October 28, 1986, the Hatco Chemical Corporation was renamed the Hatco Corporation. (Stipulation No. 8)

### 2. Manufacturing

13.* Upon arrival at the Fords property in 1954, the Hatco Chemical Company had one reactor, one stripper, one refiner, a filter press and tanks. (1878:5 (Kaufman))

14.* From approximately 1954 until 1959, two plants were in operation at the Hatco Chemical Company: (1) an esterification plant (Ester I) where plasticizers and synthetic lubricants, including dioctyl phthalate, dibutyl phthalate and diisooctyl phthalate, were manufactured from acids and alcohols; and (2) a sebacic acid plant where raw materials were generated to make aviation turbine oils. (Stipulation No. 5; (1882:9 (Kaufman)))

15.* During this period, alcohols, sebacic acid and phthalic anhydride were stored at the site and the railroad siding was used to load and unload tankers. (1989:22 (Kaufman)) Other raw materials brought to the site included octyl alcohol, butyl alcohol, 2–ethylhexyl alcohol and castor oil. (E10 at WRG06810; Hackman Dep. 52:12)

16.* Grace's 1959 purchase brought the necessary capital for expansion. (1884:20 (Kaufman)) Besides continuing to produce various phthalate esters in the Ester I plant, during the 1960s, additional manufacturing facilities were built at the site.

17.* In 1960, the Hatco Chemical Division constructed and began operating a benzyl chloride plant. The plant manufactured benzyl chloride which in turn was combined with phthalic anhydride to produce butyl benzyl phthalate ("BBP"), a plasticizer. (Stipulation No. 15) The benzyl chloride plant operated until 1965. (37:8 (Raviv); Stipulation Nos. 15, 60) Plaintiff Hatco never has manufactured butyl benzyl phthalate. (Stipulation No. 35)

18.* In 1961 and 1963, the Hatco Chemical Division built two plants on the eastern portion of the Fords property, known as PA–1 and PA–2. These plants manufactured phthalic anhydride from naphthalene. (Stipulation No. 10) George Napack was hired to oversee the construction and operation of the PA plants. (Napack Dep. 18, 217–18)

19.* The Hatco Chemical Division began the manufacturing operations of PA–1 in 1961 and PA–2 in 1963. (Stipulation No. 11) Production of phthalic anhydride at the two PA plants ceased in 1971. (Stipulation No. 12)

20.* The Hatco Chemical Division continued to use phthalic anhydride in its operations, purchasing quantities from outside suppliers to manufacture various esters. The use of purchased phthalic anhydride at the Fords facility continues to the present day. (Stipulation No. 13)

21.* While the PA plants were in operation, still bottoms from the [phthalic anhydride] production were deposited in an area to the east of the PA plants referred to as the "PA Disposal Area." (Napack Dep. 47–48)

22.* In 1961, the Hatco Chemical Division installed a molecular still in the Ester I tank farm to separate by-products manufactured in the sebacic acid plant. The molecular still was closed in 1965. (Stipulation Nos. 16, 60; 1066:2–11 (Trela))

23.* In or around 1960, the Hatco Chemical Division installed two thermal units ("SH–1 and SH–2") to provide heat for a new reactor added in the Ester I plant. (E22, 23, 29) From approximately 1961 to 1966 aroclor

was used as a heat transfer fluid in the hydrotherm units. (Stipulation No. 27)

24.* In 1970, Grace constructed a second esterification plant ("Ester II") to manufacture DOP and other phthalate esters. (1239:21 (Reid)) The Ester II plant remains in operation today at the Fords facility.

25.* After Hatco purchased the facility in 1978, it continued to manufacture a variety of plasticizers, including di-n-butyl phthalate ("DBP"), bis (2-ethylhexyl) phthalate ("DEHP"), diisodecyl phthalate and DOP. (E1043 at A301887; 186:25–187:2 (Raviv) (Hatco and Grace made same use of Ester I complex)); (2170:18–21 (Staples) (same))

26.* Other chemicals that have been used and stored at the site since 1978 include benzene ("BZ"), 1,1,1–TCA ("TCA"), methylene chloride, styrene, xylene and toluene. (E968, 1241, 1737)

27.* In the post–1978 period, Hatco began the manufacture of phenyl xylyl ethane ("PXE"), which required the use of xylene and styrene. (E1043 at A301975, 1410 at A301646; 1243:5 (Reid) (PXE manufacture began in early 1980s))

28.* Since 1978, Hatco has used the Ester II plant to manufacture various phthalate esters, including DOP, DEHP and DIDP, and to distill PXE and TCA bottoms. (2179:22–2180:11, 2905:4–23 (Staples); Lynch Stipulation ¶¶ 6, 7; Maimon Stipulation ¶ 34; E1404)

29.* In 1983, Hatco modified existing facilities and constructed a new plant at the Fords site to manufacture Z–Aspartic Acid ("ZAA"). (Maimon Stipulation ¶¶ 1–3; Napack Dep. 45:20–46:9; 152:8 (Raviv)) These facilities are located in the area of the former benzyl chloride plant. (146:16 (Raviv)) By June 1984, the ZAA facility was in the semi-commercial startup phase. (1339:15 (Chryss))

30.* In 1986, plaintiff Hatco dismantled the two PA plants at the Fords facility. (Stipulation No. 72)

**3. Waste Treatment**

31.* Between 1954 and 1959, Hackman dug at least one settling pond at the Fords facility that was designed to handle waste by allowing product to separate from water. (1881:14 (Kaufman); 33:10–19 (Raviv); E10 at WRG06830; DE001) During this period, liquid wastes flowed into the pond system. (E10 at WRG06830) After settling, the effluent was released from the pond and flowed through marsh land into the Raritan River. *Id.;* (1891:19 (Kaufman))

32.* By 1961, Grace had expanded the pond system, adding additional ponds, one of which subsequently was divided into two ponds, for a total of four ponds at the site. (E12, 15; Stipulation No. 59)

33.* With the settling pond system, Grace sought to minimize the amount of process waste discharged and to recover suspended solids containing product. To accomplish these goals, Grace skimmed the esters and other organic matter that floated to the surface of the ponds and neutralized the remaining liquid effluent with lime slurry. The recovered product was returned to the plant to manufacture off-color plasticizer ("OCP") to sell as a Grace product. (Stipulation No. 18)

34.* While in operation, semi-solid matter accumulated in the ponds, thereby necessitating periodic cleaning. (Stipulation No. 17) Known as "demucking," this process involved scooping solid material from the bottom of the ponds. (Stipulation No. 19) The dredged material was deposited in an area west of ponds three and four known as the "muck storage area." (40:16–43:5 (Raviv))

35.* From 1959 until 1971, Grace discharged waste products from the various plant operations into the ponds system. Aroclor leaks, liquid waste effluent from the Ester I and benzyl chloride plants and Ester I leaks and spills of phthalates and raw materials were discharged to the ponds. (Stipulations Nos. 31–34)

36.* In 1966, Grace completed the construction of sewer lines at the site to connect the Fords facility to the Middlesex County Sewerage Authority ("MCSA"). The MCSA later changed its name to the Middlesex County Utilities Authority ("MCUA"). (Stipulation No. 20)

37.* As part of the MCSA connection, Grace installed two clay-lined lagoons at the Fords facility. (Stipulation No. 21) The lagoons were designed and used, until 1971, as a temporary storage location for plant effluent prior to discharge to the MCSA. (Stipulation No. 36; Ackelsberg Dep. 204:14–20)

38.* When Grace's gravity-based settling pond system and the clay-lined lagoons were in operation between 1966 and 1971, process effluent flowed from the settling ponds to the clay-lined lagoons to sewers connected to MCSA. (Stipulation Nos. 22, 36) Liquid waste from the [PA] plants was released to the lagoons and ultimately to the MCUA. (Stipulation No. 37)

39.* In 1969, [DEP] directed the Hatco Chemical Division of W.R. Grace to eliminate the ponds because of odor problems. (Stipulation No. 24) The Hatco Chemical Division completed the pond elimination program in March 1971. (Stipulation No. 25) Plaintiff Hatco never operated the settling pond system or the muck storage areas. (Stipulation No. 26)

40.* In 1990, plaintiff Hatco began operating an effluent pretreatment plant (the "EPT plant") at the Fords site. (Stipulation No. 13) The main purpose of the EPT plant was to reduce the organics in Hatco's effluent prior to its discharge to the MCUA. (715:7–14 (Raviv))

### 4. Location of Site Facilities [6]

41.* Throughout, the history of the site, the manufacturing and waste disposal facilities largely have been situated in the central portion of the site. In aerial photographs, this concentration of buildings and other artificial structures forms a capital letter "T" with the vertical structures traveling north to south and the horizontal improvements running east to west.

42.* During Grace's ownership, the Ester I complex served as the industrial center and was bounded on the west by the Ester I tank farm and to the east by the two PA plants. To the south of the PA plants four large tanks, known as the "M tanks," were installed to store the naphthalene used in PA production. Continuing south from the M tanks, the Ester II building appears. West of Ester II, two railroad sidings, one serving each ester plant, run north from the southern boundary of the property.

43.* Directly to the south of the Ester I complex two ponds were located, pond number one to the west and pond number two to the east. Two larger ponds were found further to the south, pond number three to the east and pond number four to the west. The sebacic acid plant was situated to the east of ponds one and two. East of ponds three and four, the benzyl chloride plant was located. A muck storage area was created southwest of ponds three and four. At the southern boundary of the property, just west of the railroad sidings, the two lagoons were constructed.

44.* Due north of these manufacturing and waste structures, a pilot plant, the quality control laboratory, the alcohol tank farm and drum storage areas were located.

45.* Many of these structures remained unchanged following Hatco's purchase of the site. During the pond elimination program, Grace reclaimed the areas of the site the ponds and muck storage areas had occupied. Hatco constructed the EPT plant in the area of former pond four. Hatco also added the ZAA facility, converting the former benzyl chloride plant and constructing a new building just south of former ponds one and two.

### D. Contamination Overview

#### 1. Sampling

46.* In August 1979, the DEP visited the Hatco site and took a single sample from the surface of each of the two lagoons. (1220:3–1221:10 (Reid); E699) In March 1980, DEP officials returned to the Hatco site and gathered soil samples. (1229:7–17 (Reid))

6. The site description is drawn from the aerial photographs of the site presented at trial as demonstrative exhibits one through 11 and the corresponding testimony of Dr. Dan Raviv. (32:20–49:17 (Raviv)) Knowledge of the site plan is essential to a proper understanding of the apportionment opinion which is based in part on the migration of contamination from one portion of the site to another.

47.* In 1981, the DEP's selected seven groundwater monitoring well sites, beginning the first systematic testing at the Hatco facility. (214:15–23 (Raviv)) Paulus, Sokolowski and Sartor, Inc. ("PS & S"), an environmental consulting firm, installed these wells in 1982. (66:11–15 (Raviv))

48.* Subsequent DEP spot sampling of the lagoons and other portions of the site occurred in 1981 (876:23 (Trela); E720), 1984 (879:6 (Trela); E825) and 1985. (883:1 (Trela); E881) The MCUA drew samples of Hatco's sewer waste water in 1986. (886:19 (Trela); E1040)

49.* As a result of the DEP's continued interest in the site, in 1986 Hatco hired DRAI to provide advice with respect to the DEP's demands. (1443:3–10 (Chryss)) DRAI installed additional groundwater monitoring wells in 1987, 1990 and 1992, (65:23–66:22, 214:15–23 (Raviv)), and performed surface and subsurface soil investigations in various areas throughout the site in 1987, 1988, 1991 and 1992. (E2253) The DEP specified the groups of chemicals to be tested as well as the testing methods. (97:7–21 (Raviv))

50.* Based on evidence of historical activities at the Hatco site, DRAI created areas of environmental concern ("AECs"), a basic concept in any kind of environmental investigation of plants, which allowed it to examine the impact of particular operations at relevant parts of the site. See Appendix III. (54:2–23 (Raviv)) DRAI also developed a grid system to guide its soil studies. (DE013; 64:11–19 (Raviv)) In areas where contamination was found, the density of the grid was increased in order to fine-tune its delineation. (64:20–65:22 (Raviv))

51.* In 1987 and 1988 Exxon Chemical ["Exxon"], a potential Hatco purchaser, hired Environ, an environmental consulting company, to come to the site and conduct testing. Environ examined soil and groundwater conditions at Hatco. (1472:8–20 (Chryss))

## 2. Contaminants

52.* The resulting data indicates that the Hatco site contains three principal contaminants: (1) base neutrals ("BNs"); (2) polychlorinated biphenyls ("PCBs"); and (3) volatile organic compounds ("VOCs"). (69:6 (Raviv))

53.* BNs, also known as semivolatiles, are a subset of organic chemicals. (919:11 (Trela)) This category includes different phthalate esters, including DEHP, BBP, DEP, DBP and DOP, (93:4, 69:8, 75:21 (Raviv)), as well as petroleum products and naphthalene. (2068:2 (Staples)) BNs are the source of the greatest volume of contamination at the Hatco site. (2067:2–15 (Staples))

54.* Two types of PCBs were found at the site, aroclor 1248 and aroclor 1254. When tracing the history of PCBs, it is important to evaluate reports of the presence or absence of PCBs carefully. (882:12 (Trela)) Obtaining accurate PCB results is difficult, because the applicable testing method is susceptible to interference by organic chemicals, such as the phthalate esters present at the Hatco site. (880:5, 881:1 (Trela)) Testing of soil borings is more accurate than testing of groundwater samples. (888:6 (Trela))

55.* Sampling also revealed the presence of a variety of VOCs. This category of chemicals includes solvents such as toluene, xylene, TCA, TCE and benzene. (76:3 (Raviv))

56.* These pollutants are distributed throughout the site at various depths and concentrations. To some degree, each group of contaminants is present in the soils and the groundwater. Often these chemicals are commingled in the same soil. The DEP primarily is concerned with the VOC contamination in the groundwater and the PCB soil contamination. (742:4–20 (Raviv); E2453 at A216332)

## E. Remediation By Hatco

57. Since its purchase of the site in 1978, Hatco has undertaken four remediation projects: (a) Project 50; (b) Project 51; (c) the removal of PCB–contaminated liquid, including lagoon skimmings, from the site; and (d) the excavation of material from the PA Disposal Area. The two latter remediation activities were required by Exxon as conditions precedent to its potential purchase of the facility. (1852:19–23, 1854:17–1855:18 (Chryss); E1365 at Exxon 00135)

### 1. DEP Involvement at the Fords Property

58. Certain response costs sought by Hatco may be traced to involvement at the site by DEP, which directed Hatco to undertake various remediation activities. With respect to Hatco's ownership, DEP initially visited the site to investigate the discovery of oil in Crows Mill Creek. *Hatco III*, 836 F.Supp. at 1082.

59. In October 1979, DEP directed Hatco to begin a pollution abatement program, under which Hatco would excavate contaminated soil from the site and install monitoring wells. *Id.* at 1082–83.

60. On June 16, 1981, following visual inspections and tests confirming contamination, DEP issued an Administrative Order directing Hatco to perform soil borings, install monitoring wells, cease groundwater pollution and remove contaminated soils from the site. Hatco responded by sampling the lagoons and requesting an administrative hearing. *Id.* at 1083.

61. On September 28, 1982, following negotiations, DEP and Hatco executed an Administrative Consent Order ("ACO I"), under which Hatco was to install seven groundwater monitoring wells and sample the wells periodically during the following five years. *Id.*

62. On April 15, 1985, DEP ordered Hatco to close the effluent line to the lagoons by April 18, 1985. *Id.*

63. On December 16, 1985, DEP issued a draft New Jersey Pollutant Discharge Elimination Permit ("NJPDES permit") which required Hatco to submit to DEP a plan for closing the lagoons. *Id.*

64. Following more negotiations, and the beginning of DRAI's work at the site, DEP issued the final NJPDES permit on April 22, 1987. *Id.* By November 1987, Hatco had instituted measures designed to comply with the minimum regulatory requirements of the NJPDES permit. *Id.*

65. By the spring of 1991, Hatco recognized the need for an administrative consent order to finish site remediation. On October 30, 1991, the first draft consent order was issued, which directed a Remedial Investigation/Feasibility Study ("RI/FS") and the implementation of a remediation action plan for the site. *Id.* at 1084.

66. On August 5, 1992, DEP issued a directive to Hatco and Grace, requesting that they arrange for the cessation of the environmental threat at the Fords site within thirty days. Hatco filed its draft RI on August 26, 1992, and signed the consent order ("ACO II") on September 9, 1992. Grace refused to sign ACO II, but submitted a timely response to DEP. *Id.* at 1082, 1084.

67. Under ACO II, Hatco completed a remedial investigation and a scoping report and investigation, including a remedial investigation work plan, field work and a final report. *Id.* at 1084.

### 2. The PA Disposal Area

### a. The Manufacturing of Phthalic Anhydride

68. In 1961 and 1963, the Hatco Chemical Division built two plants on the eastern portion of the Fords property, known as PA–1 and PA–2. These plants manufactured phthalic anhydride. (Stipulation No. 10) George Napack was hired to oversee the construction and operation of the PA plants. (Napack Dep. 18, 217–18).

69. Manufacturing operations began at PA–1 in 1961 and at PA–2 in 1963. (Stipulation No. 11) Production of phthalic anhydride at the two PA plants ceased in 1971. (Stipulation No. 12).

70. The Hatco Chemical Division continued to use phthalic anhydride in its operations, through purchases from outside suppliers to manufacture various esters. The use of purchased phthalic anhydride at the facility continues to the present day. (Stipulation No. 13)

71. In 1986, plaintiff Hatco dismantled the two PA plants at the Fords property. (Stipulation No. 72)

72. Naphthalene and air were the raw materials used to manufacture phthalic anhydride. The manufacturing process differed between the two plants. At PA–1, naphthalene was fed directly into a stream of hot air

inside a system known as a fluidized bed reactor. PA–2 utilized a fixed-bed reactor, which required the naphthalene first to be reduced to vapor in a naphthalene evaporator prior to being introduced into the reactor. (Napack Dep. 164–67; Ackelsberg Dep. 100–01; Rush Dep. 173)

73. Naphthalene has a distinctive odor similar to the smell of moth balls. (3216:14–19, 3387:10–12 (Siet)). Raw naphthalene is amber in color. Pure phthalic anhydride is white. (Rush Dep. 191)

74. The phthalic anhydride manufacturing processes at PA–1 and PA–2 generated a molten distilled residue, which was poured into pie-shaped containers and cooled. In this form, the byproduct is known as a solid still bottom ("PA still bottom" or as designated under CERCLA "K024"). (Napack Dep. 47–56; Ackelsberg Dep. 100–01; Biertumempfel Dep. (Vol. 1) 56–57). The PA still bottoms were black in color and brittle in substance. (Napack Dep. 48–50; Nagiewicz Dep. 73–74)

75. The process at PA–1 required naphthalene of a higher purity. The PA–2 system used naphthalene of a much cruder quality, which produced a still bottom with more impurities and greater contaminants. (3230:4–12 (Siet); Napack Dep. 51–52) Naphthalene is not a component of the PA still bottoms; it dissipates in the phthalic anhydride cooking process. (3224:4–11, 3256:5–3257:1 (Siet))

76. The naphthalene evaporator at PA–2 also generated still bottoms ("naphthalene still bottoms"), which were viscous or tarry in substance, dark brown in color and constituently different from PA still bottoms. (Napack Dep. 164–67; Rush Dep. 185–86, 191)

**b. Disposal of the PA and Naphthalene Still Bottoms**

77. From 1961 to 1964, George Napack managed the Hatco Chemical Division's PA plants and was involved in the decision to dispose of PA still bottoms as landfill. (Napack Dep. 60–61)

78. From 1961 to 1964, Harland Rush was a foreman and supervisor of the PA plants. (Rush Dep. 18–19)

79. Between 1961 and 1967, PA–1 generated an estimated 2,213 tons of PA still bottoms. Between 1964 and 1971, PA–2 produced an estimated 2,500 tons of PA still bottoms. (E1247)

80. While the PA plants were in operation, PA still bottoms were deposited on the grounds east of PA–2 known as the PA Disposal Area (AEC 7A),[7] which was downgradient from the PA plants, had the appearance of an empty field and had no lining, pads, dikes or containment. (Napack Dep. 48, 63–64, 215–16; E2571 at H511288; 351:11–23 (Raviv); Biertuempfel Dep. (Vol. 2) 93–95; Rush Dep. 130–32)

81. The PA Disposal Area was a discrete, well-defined area, which also was used to dispose of phthalic anhydride and materials or waste containing naphthalene. (E1152A; E1282; 3224:17–3225:1, 3304:4–3305:19 (Siet))

82. Naphthalene still bottoms produced by the naphthalene evaporator at PA–2 were discharged into an area located to the northeast of the PA plants ultimately referred to as the "Naphthalene Disposal Area" (AEC 14). (Nagiewicz Dep. 76–78; Dominach Dep. 211–12)

83. There was a distinct line of demarcation between the PA Disposal Area to the east of the PA plants and the Naphthalene Disposal Area to the northeast of the PA plants. (Rush Dep. 185–86)

84. While DEP has concluded that phthalic anhydride and naphthalene are significantly degradable, the PA and naphthalene still bottoms in the PA and Naphthalene Disposal Areas were sufficiently persistent to remain in the environment twenty years after they were deposited. (E1995; 3494:16–3495:9 (Siet))

---

7. Relying on the historical records of the Fords property and facilities, DRAI delineated areas of environmental concern ("AECs"), a basic concept commonly utilized in environmental investigations at industrial sites. *Hatco III*, 836 F.Supp. at 1058. In *Hatco III*, the Court apportioned liability by AEC, and in this Opinion, will occasionally refer to particular AECs when relevant. *See* Appendix II.

85. Sling Tail Creek runs within twenty feet of the eastern boundary of the PA Disposal Area. (353:9–15 (Raviv)) Surface waters generally run off the PA Disposal Area to the east or southeast, in the direction of Sling Tail Creek, which in turn flows into the Raritan River. (Stipulation No. 50)

86. There are no public drinking ·water wells downgradient from the PA Disposal Area. There are four drinking wells located within a mile upgradient. (3589:11–13 (Mercer)) The State of New Jersey has designated the groundwater in the area of the Fords property as a potential source of drinking water. (3671:1–8 (Mercer))

87. Aquatic life exists in Sling Tail Creek. (3683:11–17 (Mercer))

88. When combined with water, phthalic anhydride hydrolyzes to phthalic acid, which is very mobile. The PA Disposal Area contained a mobile hazardous waste that could, and in fact did, migrate to the groundwater and to Sling Tail Creek. (3223:7–11 (Siet); 3686:6–3687:3 (Mercer))

89. In August 1988, contamination in the PA Disposal Area posed an imminent threat of migrating to groundwater and to Sling Tail Creek. (3632:6–9, 3648:9–22 (Mercer))

### c. Investigation, Sampling and Testing of the PA Disposal Area

90. In July of 1981, approximately twenty years after the first PA and naphthalene still bottoms were deposited, DEP, during a routine investigation, collected two leachate samples along Sling Tail Creek. (E750, E769) One sample, taken from a location adjacent to the Naphthalene Disposal Area, contained a naphthalene concentration in excess of 300 parts per million ("ppm"). (E771; 3563:10–3565:20 (Mercer)) The other sample, taken from a location further downstream, and adjacent to the PA Disposal Area, contained no traces of naphthalene. (E771; 3563:10–3565:20 (Mercer))

91. In 1981, DEP selected seven groundwater monitoring well sites, which began the first systematic testing at the Hatco facility. (214:15–23 (Raviv)) PS & S installed these wells in 1982. (66:11–15 (Raviv)) One well, known as "4S," was installed in 1983, in an area adjacent to Sling Tail Creek, downgradient of the PA and Naphthalene Disposal Areas, and approximately 50 to 70 feet from the PA Disposal Area. (Stipulation No. 52; 353:18–22 (Raviv))

92. By April 22, 1987, DEP determined that contamination in Well 4S reflected an actual discharge of pollutants into the groundwater, posing a potential threat to public health, safety and the environment. DEP issued the NJPDES permit to regulate the actual or potential discharge to groundwater. (E1070; 3191:17–3194:21, 3379:14–22 (Siet)) VOCs and BNs were found in Well 4S. (3394:19 (Siet)) At this time, DEP had not identified the PA Disposal Area as the source of the contamination in Well 4S. (3197:12–19 (Siet))

93. While considering the cost of complying with the NJPDES permit, in October 1987, Hatco first recorded the fact that the PA Disposal Area was an area of environmental concern that potentially could require remediation. (E1112; 3204:18–3207:18 (Siet)).

94. On November 2, 1987, Hatco compared contamination levels in Well 4S to the legal limitations imposed under New Jersey Ground Water Quality Standards. Many of the contaminants in Well 4S exceeded the New Jersey standards. (E1119; 3209:10–22, 3211:8–3214:9 (Siet)). On the same day, Hatco did some exploratory digging in the PA Disposal Area and discovered naphthalene and phthalic anhydride waste materials and parts of six drums, which, based upon visual identification, contained phthalic anhydride (E1121; 3214:10–3215:19 (Siet); 3684:20–3685:10 (Mercer))

95. In December 1987, Environ took soil samples from the PA Disposal Area during an environmental assessment at the Fords property. These samples confirmed the presence of wastes generated during the phthalic anhydride manufacturing process. (Stipulation No. 53; E1607 & Table 1; E1655; DE013; 367:21–368:22 (Raviv))

96. On February 17, 1988, Hatco notified Grace of the potential need to remediate the PA Disposal Area, including the estimated volume of material and costs. (E1174–75)

97. By March 1988, Hatco's environmental consultant, DRAI, had linked the groundwater contamination in Well 4S to the contaminants in the PA Disposal Area. DRAI proposed to DEP that additional soil sampling be conducted in conjunction with the groundwater monitoring which was then on-going under the NJPDES permit. DRAI concluded that, left untouched, contaminants from the PA Disposal Area would continue to leach into the groundwater and ultimately enter Sling Tail Creek. (3234:19–3237:2, 3378:21–25 (Siet); 359:10–13, 363:5–7 (Raviv))

98. In June 1988, DRAI completed a draft report on the soil samples taken in March 1988. (E1232) This report detailed the conditions of the soil below the surface of the PA Disposal Area. The sampling results indicated the presence of phthalic anhydride and phthalic acid. (32691:1–3270:2; 3287:13–3288:3 (Siet))

99. In another June 1988 report, Hatco's Research and Development Department documented the continuing testing and assessment of the PA Disposal Area. (E1231)

100. Water samples obtained from the PA Disposal Area in June 1988, indicated concentration levels of phthalic anhydride or phthalic acid at 2,000 to 5,000 ppm, which were characterized as high concentration levels. (E1268; 3712:2–8 (Mercer))

101. Where soil or groundwater sampling indicates the presence of a contaminant that has not been targeted in the study, the contaminant is referred to as a tentatively identified compound ("TIC"), meaning that the contaminant has been positively identified, but its concentration level has not been determined accurately. (3434:20–3435:13 (Siet))

102. In June 1988, DRAI documented TIC data indicating the presence of phthalic anhydride in twenty-two samples taken from the PA Disposal Area. (E1261)

103. In July 1989, DRAI prepared a formal report on soil and sediment investigation, which included the March 1988 sampling results from the PA Disposal Area. (E1563) The TIC data from July 1988 was not incorporated in this report. (3459:1220 (Siet)) The report documents three or four positive findings of phthalic anhydride, not all of which may be linked to the PA Disposal Area. (3612:22–3613:17 (Mercer)) DRAI sampling of Sling Tail Creek sediment, taken from locations adjacent to or near the PA Disposal Area, registered low levels of BNs. (DE0123; 3587:24–3587:14 (Mercer))

104. In August 1988, DRAI prepared a formal report on the groundwater sampling taken in April 1988, which included the results from Well 4S. (E1297)

### d. The Decision to Excavate
#### (1) Assessment

105. Hatco's ability to assess the PA Disposal Area was enhanced by the onsite presence of Hatco chemists and personnel who were employed at the facility during the operation of the PA plants. These long-standing employees knew how the still bottoms were generated and where they were discarded. (E1247; E1248; 3169:20–3170:2, 3180:2–7 (Siet)) Hatco's experienced personnel also knew the chemical properties of the disposed materials and understood that BNs, not VOCs, were the contaminants that would be associated with the PA Disposal Area. (3406:18–3407:7 (Siet))

106. Hatco's preliminary assessment of the PA Disposal Area was comprised of a review of the site history, aerial photos and laboratory results compiled by DRAI, Environ and Hatco chemists and personnel. (E1252; 3179:25–3180:14 (Siet))

107. Hatco considered the actual impact on groundwater and the threat to surface water. (3181:16–25 (Siet)) Hatco had available for its evaluation groundwater and soil testing data, which had been collected and analyzed by three different groups: DRAI, Environ and Hatco's own internal chemists. (E1152A; E1232–33; 3170:3–14, 3225:17–24 (Siet))

108. Prior to and during the excavation of the PA Disposal Area, Hatco never considered—or was even aware of—the relevant NCP criteria that would impact a subsequent cost recovery action. (3170:15–23, 3171:11–13 (Siet)) Hatco did not prepare an RI/FS in connection with the PA Disposal Area. (3183:25–3184:2 (Siet)) Hatco did not publish

a formal public comment in any newspaper. Hatco did not request that DRAI perform an environmental fate and transport analysis, a theory which ascertains the migration of various pollutants within the subsurface or soil matrix. (3331:22–3332:15; Raviv Dep. 2161–63)

109. Notice of the contamination and plans to excavate the PA Disposal Area was provided to DEP and to Grace. (E1174–75; E1229; E1235; E1282; E1283; E1327; 3191:7–11 (Siet))

110. While Hatco failed to specifically consider NCP requirements, Hatco paid close attention to New Jersey pollution limitations for groundwater in relation to Well 4S and the NJPDES permit. Hatco was also aware that treatment of the PA Disposal Area would require government oversight in the form of permitting. (E1152A; E1154; E1249; 3221:25–3222:3 (Siet))

**(2) The Need for a Response Action**

111. Hatco identified the PA Disposal Area as a source of release.[8] (3667:12–18 (Mercer)) While the historical record indicates that there was an imminent threat of release, Hatco did not document that such a conclusion had been reached prior to excavation of the PA Disposal Area. (3668:3–3669:3 (Mercer)) No one—not Hatco, DRAI or any other party—produced a document prior to excavation in 1988 indicating that there was a threat to Sling Tail Creek. (3379:6–10 (Siet))

112. As to the magnitude of the threat, the historical record indicates that Hatco had contaminant concentrations from water samples taken from Well 4S, and from soil samples taken from the PA Disposal Area, which were viewed in relation to New Jersey's des-

ignation that groundwater in the area was a potential drinking water source. (3670:5–3671:14 (Mercer))

113. Hatco also understood the nature and extent of K024 material in the PA Disposal Area. (3172:16–20, 3175:7–15 (Siet))

114. With respect to K024, there is no metamorphosis from hazardous substance to hazardous waste—K024 is a listed hazardous waste under CERCLA and the Resource Conservation and Recovery Act ("RCRA") (42 U.S.C. §§ 6901, et seq.). Leachability studies are not required to determine whether K024 is a hazardous waste. (3682:6–11 (Mercer)) The presence of K024 in an uncontrolled landfill represents a threat. (3380:23–3381:2 (Siet))

115. Hatco took action in response to a release or threat of release of a hazardous substance. (3172:11–13 (Siet)) In 1988, there were actual releases into Well 4S and Sling Tail Creek. (3680:10–3681:3 (Mercer)) Absent a response action, future releases from the PA Disposal Area would have occurred. (3705:3–6 (Mercer)) [9]

116. Although unaware of the term "ARAR" (applicable or relevant and appropriate standard), Hatco considered applicable ARARs in substance, including (a) New Jersey Groundwater Quality Standards and New Jersey drinking water standards, as incorporated in the NJPDES permit, (b) federal and state cleanup requirements, including the state action level for BNs, and (c) EPA's proposed regulation prohibiting land disposal of materials that contained certain concentration levels of K024. (E1119; 3194:2–20, 3198:4–3200:1, 3249:6–17 (Siet); Raviv Dep. 2581)

8. Additional activities that Hatco might have undertaken to identify the source and nature of release or threat of release include (a) determining upgradient chemistry between the PA and Naphthalene Disposal Areas, and (b) performing more calculations or a mass loading (mass of contaminant per time released) in order to confirm suspicions that Well 4S contaminants were linked to the PA Disposal Area. (3576:17–25 (Mercer))

9. Additional activities Hatco might have undertaken to assess the magnitude of potential threat include: (1) comparing concentrations to action

levels or treatment standards, (2) verifying concentrations of the K024 hits recorded in TIC data gathered in July 1988, (3) performing mass loadings, and (4) characterizing migration pattern—vertical or horizontal—through plume wells in order to assess contamination beyond the immediate vicinity of the PA Disposal Area and well 4S. (3593:3–3598:12 (Mercer)) To analyze the threat to public health, Hatco might also have identified further the public receptors and measured the concentrations and environmental impacts at those public receptors. (3578:13–15, 3580:6–7, 3583:18–20 (Mercer))

### (3) The Potential Sale to Exxon

117. In 1987–88, Exxon considered purchasing the Fords property and the chemical plants. (3185:23–3186:2 (Siet))

118. As of June 29, 1988, Exxon was insistent that Hatco excavate all materials from the PA Disposal Area as a prerequisite to any purchase. (E1264; 3343:17–22 (Siet))

119. On November 3, 1988, Exxon executed a letter of intent to purchase the property and facilities. (E1365)

### (4) The EPA Land Ban of K024

120. On April 8, 1988, EPA issued a proposed regulation limiting excavation and off-site disposal of certain hazardous materials, including K024, after August 8, 1988. Beyond this effective date, incineration would be the EPA-accepted method of treatment for K024. (Stipulation No. 55) Due to inadequate incineration capacity, the proposed regulation contained a two-year variance for K024, deferring the effective date of proposed land ban on K024 until August 8, 1990. Consequently, under the proposed regulation, any nonwastewater containing K024 in excess of six mg/kg could not be land disposed after August 1990 without the proper variance.

121. Hatco had not anticipated the proposed land ban of K024. The record reveals that even as late as April 5, 1988, Hatco had not learned of EPA's imminent proposal. (3227:25–3228:6, 3240:3–5 (Siet))

122. On April 18, 1988, Exxon advised Hatco of the proposed land ban of K024. (E1215)

123. On May 17, 1988, EPA issued another proposed regulation which removed K024 from the two-year variance list. Under this second proposal, land disposal of K024 would be limited as of August 8, 1988. However, the proposed regulation did contain a two-year variance for contaminated soil, but not soil waste. The distinction between contaminated soil and soil waste was unclear. EPA solicited from the public proposed methods

for distinguishing contaminated soil from soil waste.

124. Hatco did make some effort to determine whether the proposed soil variance would apply to the K024 materials in the PA Disposal Area. On May 23, 1988, less than one week after EPA published the second proposed land ban, Hatco officials met with DEP to discuss the proper waste classification of the soil and materials in the PA Disposal Area. (E1229)

125. By a letter dated June 14, 1988, Hatco sought from EPA clarification regarding the definition and extent of the proposed soil variance. (E1251; 3672:22–25 (Mercer))

126. Hatco did not, however, prepare or consider any data in relation to the specific standards of the land ban. Visual or aerial inspection of the site—even by persons familiar with the history and contents of PA Disposal Area—would not reveal (a) the presence of any K024 in excess of the land ban standard, or (b) the volume of K024 material within the PA Disposal Area that exceeded the proposed standard. (3489:13–25 (Siet))

127. The final version of the land ban, published August 17, 1988, contained the two-year variance for the land disposal of soil, but maintained the distinction between contaminated soil and soil waste. However, EPA was unable to create a generally applicable method for distinguishing the two types of soil and decided that such determinations would be made on a case-by-case basis. (3311:21–3312:9 (Siet)) In the final regulation EPA proscribed the land disposal of nonwastewater with K024 concentrations in excess of 28 mg/kg, absent the applicability of the soil, or other approved, variance.[10]

128. Prior to the excavation of the PA Disposal Area, and even as late as the effective date of the regulation, August 8, 1988, Hatco remained uncertain in regard to the applicability of the land ban to the materials in the PA Disposal Area. (3301:22–3302:1 (Siet); 3673:1–3674:13 (Mercer))

---

**10.** EPA's proposed regulation initially prohibited land disposal of nonwastewater with K024 concentrations in excess of 6 mg/kg. *See supra*

¶ 119. Prior to issuing the final regulation, EPA discovered a significant error in its calculations and adjusted the figure to 28 mg/kg.

### (5) Alternatives and Costs

129. Hatco and DRAI considered alternatives to land disposal for the materials in the PA Disposal Area, including capping of the area, various solvent extraction methods, onsite soil recycling and physical screening technologies. (E1152A; E1154; E1161; E1242 at H503094; E1244; 3356:11–16 (Siet); 3740:22–25 (Wolfskill)) At the time, incineration was the only other demonstrated technology for treating K024 waste. (3302:20–19 (Siet))

130. Hatco understood that the expense of incineration could be four, five, or even ten times greater than the costs of landfilling. (E1215; E1282; 3186:24–3187:3, 3302:14–19 (Siet)) Mobile incineration was not a prevalent technology at the time of the excavation. Incineration would have required the physical removal and transportation of earth from the PA Disposal Area. (3187:8–17 (Siet))

131. Hatco's assessment of treatment alternatives and prospective costs was severely impacted by the uncertain applicability of the impending land ban of K024. (E1215; E1253; 3248:14–3249:17, 3264:13–3265:25, 3282:15–3283:11 (Siet); (3672:16–3673:11 (Mercer)))

132. While the land ban would not have required Hatco to treat or excavate the PA Disposal Area, the imminent implementation of the ban, and its possible application to the PA Disposal Area, impacted Hatco's cost analysis once a response action was deemed necessary. (3382:8–3384:2 (Siet))

133. In the interim period between the publication of the proposed regulations and the effective date of the land ban, the cost for landfilling increased, on average, by ten percent. (3251:1–17 (Siet)). Even with a variance, Hatco believed that access to hazardous waste landfills would become limited and costs would increase by twenty-five percent by 1989. (E1215) Any delay would either increase Hatco's landfilling costs or might result in sizeable incineration costs under the land ban.

134. Having selected the land disposal alternative, Hatco surveyed and priced various contractors for offsite disposal of the K024 materials. (E1209; E1250; E1256–57; 3239:7–23, 3282:9–14 (Siet); 3774:7–9 (Wolfskill))

135. Given the history, nature and extent of the contamination in the PA Disposal Area, the aura of uncertainty surrounding the land ban, and the alternatives and the costs, Hatco concluded that immediate excavation and offsite landfilling of the PA Disposal Area was the best and most cost-effective treatment alternative regardless of whether a variance would ultimately apply to the K024 materials. (E1215)

136. On July 1, 1988, Hatco entered into a contract with Chem Waste Inc., for the excavation and offsite landfilling of materials in the PA Disposal Area. (Stipulation No. 56) The agreement documented Hatco's inquiry into former waste disposal practices, the operations of the former PA plants and the nature and extent of materials in the PA Disposal Area. (E1271)

### (6) The Excavation

137. Hatco utilized visual inspections to delineate the PA Disposal Area and determine the extent of material to be excavated. (E1282; 3305:2–19, 3484:11–13 (Siet)) The visually identifiable materials were admixed throughout the soil in the PA Disposal Area. (3317:17–25 (Siet)) Hatco did a substantial job of determining the volume and substance of contaminants. (3614:15–24 (Mercer))

138. Hatco was prepared to stockpile any excavated material that, by visual inspection, did not appear contaminated, but no such material was discovered during the excavation. (E1271 at H50667; 3317:24–3318:5 (Siet))

139. The PA Disposal Area either was adjacent to or encompassed an area which had been designated as the PCB Swale Area. Contaminants found in the PA Disposal Area were also visually identified in and excavated from the PCB Swale Area. (3510:8–3511:13 (Siet))

140. The excavation and offsite disposal of 24,938.76 tons of material—including the estimated 5,000 tons of admixed K024—took five weeks to complete, from July 12, 1988, to August 18, 1988. (E1362; Stipulation No. 64; 3317:9–16 (Siet))

141. The excavation, originally scheduled for completion on August 8, 1988, continued two or three days beyond the effective date of the land ban—also August 8, 1988—due to heavy rains which complicated the excavation. (3246:5–15 (Siet))

142. Given the information available at the time, Hatco conducted an adequate evaluation and formulated an appropriate response to the K024 contamination in the PA Disposal Area. (3169:18–16 (Siet)) Hatco appropriately considered certain hydrogeological factors, the volume of contaminated material, the recyclability of the PA Disposal Area, and certain relevant standards or action levels. (3614:15–24, 3616:7–3617:10, 3618:18–25, 3622:4–10 (Mercer))

### 3. Project 50

143. Project 50 began after December 4, 1990, when a tankwagon of oil material taken from the EPT plant was returned to the site, having been rejected by an outside waste handling facility. The oil waste contained significant levels of PCBs with concentration levels exceeding fifty ppm—the facility was not licensed to receive materials with PCBs in excess of fifty ppm. (872:18–873:1 (Trela)) Hatco suspected, and eventually confirmed, that its effluent, discharged to the MCUA through the EPT plant, was contaminated with PCBs.

144. Approximately 200 industrial clients discharge effluent to the MCUA. DRAI ultimately calculated that Hatco was contributing potentially as much as 74% of the total allowable limit of PCBs at MCUA. (E1687; 915:3–916:21 (Trela))

145. Hatco notified the DEP, EPA and MCUA that PCBs had been discovered in the EPT plant waste. (E1801; 901:23–903:21 (Trela)) Throughout Project 50, Hatco regularly communicated with MCUA. (908:18–909:3 (Trela))

146. PCB contamination in Hatco's effluent presented a time-critical problem. On March 17, 1991, MCUA was to cease ocean-dumping of its sludge pursuant to statutory and judicial mandates. In view of this deadline, MCUA had instituted an alternative plan in which its sludge would be used in the development of a commercial agricultural product. Concern arose over the potential impact of Hatco's contaminated effluent on MCUA's land-based alternative to ocean-dumping. (E1792; 873:17–874:24 (Trela))

147. In January 1991, Hatco began to formulate and implement a scientific investigation into the nature, source, quantity and distribution of PCBs in the effluent and sewer system. Given the time-critical nature of the effluent problem, Hatco adopted protocols that were designed to produce data rapidly. (905:14–907:4 (Trela))

148. To determine the amount and distribution of PCBs in the effluent, DRAI sampled separately the PCB levels in various phases of the effluent. The goal was to discover the level of PCBs contributed to the effluent by solid particles. (910:9–911:6 (Trela))

149. Various sources at the site were linked to the PCB contamination in the sewer system and the EPT plant, including spills at the Hydrotherm Units, discharges into the ponds, spills of off-color plasticizer, spills at the capryl still, spills at the molecular still and spills from the hydrotherm systems in Ester I and the sebacic acid plant. These sources relate to Grace's ownership of the site. (1035:23–1037:6 (Trela))

150. In February 1991, Hatco began to consider specific interim actions that might be employed during Project 50. (949:14–21 (Trela)) With respect to potential PCB migration, these actions were considered and evaluated for their scientific appropriateness, technical efficiency, cost effectiveness and consistency with the ultimate remedy to be selected for the site. (Third Set of Stipulations ¶¶ 6–7; 950:14–19, 970:24–972:5, 977:15–978:23 (Trela); E1827; E1922; E1964; E1966–67; E1971; E1973; E1976; E1989; E1999; E2033; E2016; E2019; E2087; E2089; E2117; E2132; E2209) In view of these considerations, Hatco formulated an action plan for Project 50. (E1892)

151. The contractors, laboratories, engineers, and the surveying, excavating and waste disposal companies considered for enlistment on Project 50 were evaluated based upon experience, cost estimates, competence,

and the ability to complete assigned tasks and comply with applicable regulatory requirements. (993:11–21 (Trela); E1803; E1819, E1822, E1830–31; E1833–34; E1849; E1854; E1859–60; E1863; E1871; E1880; E1886; E1888–89; E1891; E1896; E1909; E1912; E1924; E1930; E1916; E1961; E1965; E1981–82; E1988; E2002–03; E2010; E2013–15; E2020; E2052–53; E2119; E2139; E2148; E2158; E2195; E2202; E2208; E2216; E2234)

152. The EPA has found acceptable only a few existing technologies for the remediation of PCB-contaminated soils. These alternatives range in cost from $500 per ton upward to $1,000 per ton for disposal of substantially contaminated soils. (962:2–25 (Trela))

153. While formulating and implementing Project 50, Hatco believed that the interim response activities constituted a removal, not a remedial, action under the NCP. (Applebaum Dep. 46–47)

154. Hatco issued public notice of Project 50, advising the public of the opportunity for comment and of Hatco's maintenance of an administrative record describing Project 50. The notice stated that George Chryss was the designated public information officer and Samuel Convery was the records custodian. Grace never submitted any comments concerning Project 50. (942:1–943:18 (Trela))

155. Hatco recognized the danger of human exposure to PCBs and, with the assistance of DRAI, designed and implemented health and safety plans and training sessions for workers at the site. DRAI oversight was utilized during Project 50 to ensure that Hatco and the contractors were complying with the relevant regulatory requirements. (E1843; E1869; E1875; E1894; E2009; 907:10–19, 946:9–948:24 (Trela))

156. The objectives of Project 50 were to isolate the areas that were contributing PCBs to Hatco's effluent and to impede the flow of PCBs into the sewer and EPT Plant. (980:18–981:23 (Trela)). In view of these goals, Hatco implemented the following interim measures:

(a) inspected, by television camera, certain existing underground sewer lines;

(b) constructed an above-ground sewer line and removed the Ester I sewer line and portions of the West Road sewer line;

(c) isolated the lagoons and installed hypalon lagoon liners;

(d) diverted the flow of swale discharge from the east lagoon to the EPT; (952:1–15 (Trela); Grassmyer Stipulation ¶ 59) and

(e) regraded, diked and paved the Ester I tank farm area ("Ester I tank farm construction projects"). (Grassmyer Stipulation ¶¶ 59, 225)

157. Prior to Project 50, Hatco had formulated a spill containment and countermeasures plan ("SPCC Plan"), which, at the time of Project 50, contained 45 proposed spill control measures. Hatco believed that DEP would accord Hatco a reasonable amount of time to implement the projects and that associated costs could be spread over several years. (E1734 at 802304, 802312) Projects proposed in the SPCC Plan and implemented in Project 50 included the installation of diking and concrete capping as part of the Ester I tank farm construction projects. (E1734 at H802311, H802316)

158. Prior to Project 50, the following measures were not part of any Hatco plans nor were they contained in any approved or proposed capital expenditure request: the installation of an above-ground sewer line to replace the Ester I sewer line and a segment of the West Road sewer line, the repair and replacement of trench drains, and the installation of asphalt and concrete caps in the Ester I tank farm area. (Chryss Stipulation ¶¶ 11–20)

a. Television–Camera Inspection of Hatco's Sewer System

159. As part of Project 50's investigative phase, Hatco hired a consulting engineering firm, Killam Associates ("Killam"), to scope certain sections of the facility's sewer system. Killam's investigation focussed principally on the Ester II and the PAA/ZAA sewer lines because these two systems were below the water table, which created the potential for

infiltration of PCBs into the system.[11] (DE064; 921:15–24 (Trela))

160. The PAA/ZAA line runs east to west from the former PA plants past the ZAA plant. The Ester II line runs east to west from the Ester II plant (AEC 5) to the EPT Plant. (DE064)

161. In March 1991, Killam performed TV-camera inspections of the PAA/ZAA and Ester II sewer lines which evidenced that both systems were in good condition and required only minor repairs in a few locations. (E1919 at H822673, H822685–86; 921:15–923:23 (Trela))

### b. The Ester I and West Road Sewer Lines

162. Hatco's sewer system generally flows by gravity from north to south. (921:10 (Trela)) Prior to Project 50, the Ester I sewer line traversed the area of the Hydrotherm Units (AEC 4) and former Ponds Nos. 1 and 2 (AEC 2), ultimately ending in the southeastern portion of the site and flowing into the PA/ZAA sewer line. (DE064; 975:17–976:22 (Trela))

163. After the load of EPT plant waste materials had been rejected for off-site disposal, Hatco learned that the Ester I sewer line and portions of the West Road sewer line were contaminated with PCBs. (872:19–873:1 (Trela))

164. Relative to other areas, the Ester I sewer line contained high levels of PCBs, indicating that it was the most significant contributor of PCBs to the EPT plant and the MCUA. (935:25–936:16 (Trela); E2075)

165. In addition, drainage from the northwest area of the Ester I tank farm (AEC 9A) flowed through an underground line into the West Road sewer, resulting in PCB migration from in and below the Ester I tank farm into the West Road sewer line. (DE064; 975:9–15 (Trela)) Only a segment of the West Road sewer line was contaminated with PCBs. (977:1–9, 983:8–24 (Trela))

166. Because the Ester I and West Road sewer lines were old and traversed areas of high PCB concentration, Hatco suspected that PCBs might have been entering the effluent via imperfections in the lines. (E1805 at H820615; Mustacchio Dep. 381–87; Grassmyer Dep. 768–69, 784–85) Hatco's suspicion concerning leaks was never confirmed, either by Hatco personnel or by Grace's hired experts who examined two sections of the Ester I sewer line. (E2415 at 7; Grassmyer Dep. 700) Minor breaks in the sewer lines were repaired by Hatco without the need for replacement of the entire line. (Grassmyer Dep. 786)

167. Hatco eventually replaced the Ester I sewer line and the contaminated segment of the West Road sewer line with an above-ground sewer line. (E8114; 974:10–977:18 (Trela); Grassmyer Stipulation ¶ 59)

168. Hatco considered alternatives to the above-ground line. Excavation of the area surrounding the sewer lines was rejected because (a) the extent of contamination in those areas had not been delineated at the time, (b) disposal of PCB-contaminated materials was extremely costly and (c) excavation was not responsive to the time-critical nature of Hatco's effluent problem. Cleaning the system was rejected as technically or scientifically unacceptable. Replacement with new underground lines was rejected due to the problems inherent in excavating PCB-contaminated soil. (977:17–978:14 (Trela))

### c. Isolation and Capping of the Lagoons

169. The lagoons (AEC 1) were originally installed as a temporary storage location for plant effluent prior to discharge to the sewer

---

11. In *Hatco III*, the Court found that soil contamination was not attributable to discharges from the sewer system. Soil contamination adjacent to the sewer lines was traced to other activities. *Hatco III*, 836 F.Supp. at 1073. Waste water and sewage sludge can escape to surrounding soils through breaks in the line where the hydrostatic pressure is greater inside the sewer. (*Id.*) Inspections revealed that the systems above the water table were in good condition with only minor repairs required in a few locations. (922:16–923:23 (Trela))

Conversely, infiltration through breaks in the sewer surface can occur only when the hydrostatic pressure is higher outside the sewer—conditions present only in systems below the water table. (*Id.*) Hence, Hatco's concern with sewer lines located below the water table.

system and the MCUA. (*supra* ¶¶ 36–38) Both Grace and Hatco used the lagoons for various purposes. In May 1984, Hatco closed the sewer line from the west lagoon. The east lagoon sewer line remained operative until both lagoons were taken out of service in 1991 during Project 50. *Hatco III,* 836 F.Supp. at 1063–64.

170. As part of Project 50, Hatco capped the lagoons, creating a physical barrier between the lagoons' PCB-contaminated sludge layer and surface waters, which would otherwise transport PCBs from the sludge to the sewer system. (985:11–20 (Trela))

171. Hatco capped the lagoons with two layers of geotextile and a third layer of hypalon, a thick plastic material which was chosen for its resistance to ultraviolet light and the organic chemicals in the lagoon. (985:22–23 (Trela); Lynch Dep. 39–43) Before deciding to use hypalon, Hatco considered various other materials and consulted with chemists and engineers. (988:23–989:2 (Trela); Chryss Dep. 1060–62)

172. Hatco considered a number of alternatives to capping. (E1893) Excavation was rejected because of the time-critical nature of the effluent problem and the high cost of disposing of PCB-contaminated material. Due to cost and potential inefficiency, Hatco also rejected the placement of a soft-structured dome over the lagoons. (985:24–987:8 (Trela))

### d. Elimination of Ester II Swale Discharges

173. Two sumps are located along the Ester II swale area (AEC 3). The sumps collect the swale flow, principally rainwater and groundwater. (Ho Dep. 70–71) The north sump, situated across from the Ester II plant, collects and pumps the swale flow to an oil-water separator and the sewer line. The south sump is situated at the southern end of the site and collects flow from the swale area below the north sump. (E2549) Prior to Project 50, the south sump pumped swale flow to the east lagoon to be discharged to the MCUA. (E919; E1884)

174. In 1989, samples taken from the Ester II swale area indicated high PCB levels

in the soil. While liquid in the swale tested non-detect for PCBs, contaminated groundwater from the swale area had seeped into the south sump. (E1591; E1642; E1660; E1799 at H823634 and last page)

175. As part of Project 50, Hatco redirected the south sump's pumping system. Instead of flowing to the east lagoon, the swale discharge was diverted through the Ester II sewer line to the EPT plant for collection and testing prior to discharge to the MCUA. (E1884; E1953; 952:13–15 (Trela))

### e. Ester I Tank Farm Construction Projects

176. Having identified the Ester I sewer line as the most significant contributor of PCBs to the effluent, Hatco suspected that the Ester I tank farm (AEC 9A) might be the source of contamination. As a result, Hatco performed extensive sampling in this area which revealed high levels of PCB contamination, ranging from several to 94,000 parts per million. (E3357; 9332:10–934:7 (Trela))

177. As part of Project 50, Hatco determined that surface waters running through the Ester I tank farm area were transporting PCBs to the sewer lines. (Chryss Dep. 1089) In response, Hatco implemented a number of construction projects in the area.

178. To pitch the flow of surface water away from the Ester I tank farm, Hatco reconstructed the northeast road. (Grassmyer Dep. 994, 996)

179. Surface water flows across the Ester I tank farm area from the northeast to the southwest. (Chryss Stipulation ¶ 10) As part of Project 50, Hatco constructed dike walls along the south and west sides of the Ester I tank farm to prevent PCBs from entering the sewer system. (980:22–981:18 (Trela); Grassmyer Stipulation ¶ 225)

180. A 1989 DEP inspection prompted Hatco to consider a number of action items, including the excavation of trench drains between Ester I plant and tank farm (AECs 4, 5). Hatco implemented this action as part of Project 50. (Mustacchio Stipulation ¶¶ 25–28)

181. In addition, Project 50 testing revealed high levels of PCBs in the trench drains within the Ester I tank farm area. (E3357; 936:18–937:25 (Trela)) Prior to Project 50, the trench drains flowed to the sewer lines eventually taken out of service during Project 50. (Grassmyer (Sewers) Dep. 462, 801–02) Thus, Hatco rebuilt and replaced the trench drains not only to isolate PCB contamination and migration, but to direct trench drain flow to the new above-ground sewer line. (980:22–981:18 (Trela); Chryss Stipulation ¶ 11; Mustacchio Dep. 576–77)

182. Hatco also constructed containment in the tank truck loading area northeast of the Ester I tank farm. This measure was designed to prevent spills from entering the Ester I tank farm area and triggering PCB migration. (980:22–981:18 (Trela); Grassmyer Stipulation ¶ 225)

183. Prior to Project 50, the floor of the Ester I tank farm Area was a patchwork of concrete and unsurfaced areas with varying grades and drainage paths. (Mustacchio Dep. 345) To impede surface water contact with the contaminated soil, Hatco installed concrete caps, including one in the open area immediately north of the 204–208 tanks and adjacent to the trench drains. This particular area had tested for PCB concentrations in the hundreds or thousands of parts per million. (E45–A–B, E3357; 954:13–955:13, 1075:5–1076:6 (Trela); Grassmyer Stipulation ¶ 225) Other materials—asphalt, gunite and synthetic liners—were considered, but were rejected as less effective than concrete, which has a structural integrity more resistant to other chemicals stored in the area. (955:25–957:23 (Trela))

184. To prevent PCB migration, Hatco also installed an asphalt cap in the open soil area of former Ponds 1 and 2, between the southern end of the Ester I tank farm and the ZAA building. (DE45A–B; 937:5–938:12, 958:12–21, 961:3–14 (Trela); Grassmyer Stipulation ¶ 225) With a diking system to contain spills, there was no threat of asphalt deterioration from chemical spills. (Mustacchio Dep. 567–68)

185. Prior to Project 50, stormwater on the Ester I tank farm area ran into the sewer. As part of Project 50, Hatco constructed a master sump and interior sump at the Ester I tank farm. The interior sump collected surface water, including flow from the northwest quadrant that had been entering the West Road sewer line, and pumped it to the newly installed above-ground sewer line. (1001:25–1002:6 (Trela); Grassmyer Dep. 993–94) The master sump collected effluent from the Ester I plant and pumped it to the above-ground sewer line. (Grassmyer Stipulation ¶ 239(f); Koch Stipulation ¶¶ 5(f), 8(f))

186. The construction measures for Project 50 were implemented between March and August 1991. As a whole, Project 50 substantially reduced PCB concentrations in Hatco's effluent. Testing subsequent to Project 50 indicated that PCB concentrations in the effluent running to the MCUA are below fifty ppm in the organic phase, which means that the effluent is no longer classified as a waste under the Toxic Substances Control Act.[12] (981:13–982:4, 1004:14–1007:18 (Trela); DE40–41, DE43) PCB concentrations in Hatco's sewer system no longer pose a threat to human populations or the environment.

### 4. Project 51

187. In June 1992, Hatco discovered seepage from the grounds in the vicinity of Warehouse No. 4, running across the pavement in a southerly direction. The seepage is a mixture of oil and water, which contains high-level concentrations of PCBs, including aroclor 1248 and 1254. (1007:21–1009:7, 1019:24–1021:2 (Trela); DE45A–B; E3352)

188. Hatco also located beneath the Ester I tank farm a drainage layer of high-permeability soils which provides a conduit for PCB migration and constituted a source for the seepage. (1086:18–1088:20 (Trela))

189. As part of Project 51, Hatco prepared an interim remedial measure work plan for the Hydrotherm Building. (E2354) Sampling conducted pursuant to this plan indicated significant PCB concentrations in the area of the Hydrotherm Building, includ-

---

12. 15 U.S.C. §§ 2601, *et seq.*

ing concentrations of 540 ppb at depths of thirteen to fourteen inches in the concrete surfacing and concentrations of 1,200–1,500 ppb in the soil underneath the concrete. (E3352) The only aroclor detected was aroclor 1248, which is attributable to Grace's use of the hydrotherms and PCB-containing heat-exchange fluids. (1107:7–11, 1025:11–1026:6 (Trela))

190. Implementing Project 51, Hatco installed three sumps to capture the contaminated seepage emanating from the grounds around Warehouse No. 4. The material in the sumps is then collected into portable tanks and transferred to Tank 206–208 for storage and testing prior to offsite disposal. To date, the sumps have been effective in preventing the spread of contamination and the exposure of workers to high-level PCBs. (1027:3–1029:23 (Trela))

191. As part of Project 51, Hatco also placed an oil recovery well into Well 15S to remove oil from the top of the water table and pump it into drums for storage and disposal. To date, the oil skimming wells have effectively removed PCB-contaminated oil from the well. (1027:8–1029:12 (Trela))

192. In implementing Project 51, Hatco has conducted sampling, considered alternative remedial measures, assessed the cost-effectiveness and technical efficacy of alternatives, maintained an appropriate administrative record, notified appropriate authorities, provided public notice, considered relevant regulations and attended to health and safety matters, including PCB exposure and migration via contact with vehicular and pedestrian traffic through Warehouse 4 area. (Third Set of Stipulations ¶¶ 8–18; 1009:8–1010:4, 1026:11–23 (Trela)) Project 51 is ongoing.

**13.** Hatco's actual response costs are greater because certain costs not included in the Damages Stipulation were included in other stipulations. *See infra* note 14. The adjusted amount requested by Hatco is $10,134,439.47.

**14.** Hatco has also proffered additional expenses incurred as part of the Ester I tank farm construction projects: $26,162.91 for building the containment in the tank truck loading areas

### F. Response Costs Incurred By Hatco

193. Hatco seeks to recover from Grace response costs totaling $10,076,579.64. (Damages Stipulation at 1, 23).[13]

#### 1. Cleanup of the PA Disposal Area

194. Hatco incurred costs of $5,004,022.76 for the clean up of the PA Disposal Area (the "PA Response Action"). (Damages Stipulation § II(E); Grassmyer Stipulation ¶¶ 3–30, Chryss Stipulation ¶¶ 2–70)

#### 2. Project 50

195. Implementing the Project 50 tasks, Hatco incurred costs of $1,577,169.75, distributed as follows:

(a) $599,623.67 for the construction of the above-ground sewer line and the removal from service of the Ester I sewer line and a portion of the West Road sewer line (Damages Stipulation ¶¶ 362–497);

(b) $14,371.12 for the inspection, by television camera, of the existing underground sewer lines (*Id.* at ¶¶ 498–502)

(c) $249,446.38 for the isolation of the lagoons and installation of the hypalon lagoon liners (*Id.* at ¶¶ 503–09);

(d) $93,977.63 for the redirection of the swale discharge from the east lagoon to the EPT (*Id.* at ¶¶ 510–25); and

(e) $561,891.12 for the Ester I tank farm construction. (Damages Stipulation ¶ 526–28, 530).[14]

#### 3. Project 51

196. Hatco has incurred costs of $71,-367.74 to implement Project 51 (Damages Stipulation ¶¶ 535–46; Milliken Stipulation ¶¶ 92–103; Chryss Stipulation ¶¶ 32–35)

(Grassmyer Stipulation ¶ 239(d); Koch Stipulation ¶¶ 3–4, 5(e), 6–7, 8(e)); and $31,696.92 for constructing the dike walls (Grassmyer Stipulation ¶ 239(b); Koch Stipulation ¶¶ 3–4, 5(b), 6–7, 8(b)). These costs do not appear in the Damages Stipulation, and therefore are assumed by the Court to be expenses incurred in addition to the $10,076,579.64 total set forth in the Damages Stipulation.

#### 4. Groundwater Monitoring: 1982–86

197. Pursuant to ACO I, issued by DEP on September 28, 1982, Hatco agreed to install seven groundwater monitoring wells and sample them periodically during the following five years. In connection with the installation and monitoring of the wells, Hatco incurred costs of $78,426.36. (Damages Stipulation ¶¶ 1–17)

#### 5. Laboratory Work: 1991–93

198. Between January 1991 and August 1993, Hatco incurred $448,188.50 in costs for laboratory analysis of samples taken from the Fords property. (Damages Stipulation § I.B., ¶¶ 18–147) These laboratory costs were incurred as part of Projects 50 and 51 and as part of investigative work performed pursuant to ACO II. (Narayana Stipulation ¶¶ 3–5, 6–46; Damages Stipulation ¶¶ 49, 58–110, 112–17, 119–43, 145–47; Milliken Stipulation ¶¶ 3–82, 107–20; E3333–35; E4034; E4037).

#### 6. Disposal of PCB–Contaminated Waste

199. Hatco incurred costs of $944,373.46 for the disposal of EPT plant waste, the sludge from the Tank 204–208 separation system in the Ester I tank farm and other PCB-contaminated materials. Those costs include:

(a) $568,725.93 for disposal of PCB-contaminated EPT waste (Damages Stipulation ¶¶ 148–76, 178, 531–34);

(b) $22,364.00 for the disposal of PCB-contaminated sludge from the 204–208 oil-water separation system in the Ester I tank farm (Damages Stipulation ¶ 168; Grassmyer Stipulation ¶ 279)

(c) $257,075.46 for the removal and disposal of PCB-contaminated soils from Project 50 (Damages Stipulation ¶ 177; Milliken Stipulation ¶¶ 83–88);

(d) $2,623 to cover ten stockpiles of Project 50 soils which were awaiting acceptance by an offsite disposal facility

(Damages Stipulation ¶ 183; Milliken Stipulation ¶ 89);

(e) $27,685.20 for the loading, offsite transport and disposal of PCB-contaminated soil excavated during the repair of the south railroad siding area, instituted between March and August 1993, to maintain the track in satisfactory operating condition (Damages Stipulation ¶ 179; Chryss Stipulation ¶¶ 21–28);

(f) $18,844.50 in fees paid to Accutest for soil testing in connection with the construction and excavation work in the Ester II railroad siding area under Hatco's SPCC plan ($3,448.54 for PCB analysis, $7,462.42 for BN analysis, $2,544.01 for VOC analysis, and $5,389.53 for metals analysis) [15] (Damages Stipulation ¶ 184); and

(g) $7,452.20 for loading and disposing of PCB-contaminated soil excavated during the upgrade of the Ester II facilities and the construction of the nearby tank farm (Damages Stipulation ¶¶ 180, 182; Chryss Stipulation ¶¶ 25–28)

#### 7. Cleanup of M Tanks

200. During the operation of the PA plants from 1961 to 1971, Grace stored naphthalene in the M tanks. (2544:5 (Staples))

201. During a twelve-month period in 1984 and 1985, Hatco used the M tanks to store lagoon skimmings, which contained PCB-contaminated liquids. Hatco discovered the PCB contamination while considering whether to sell, reprocess or dispose of the lagoon skimmings. (E949; Ho Dep. 218–19)

202. The contaminated lagoon skimmings remained on-site until 1988. (205:15 (Raviv); E1332) Certain of the M tank contents had PCB concentrations below forty-nine ppm and could be disposed as "non-PCB" material. The balance of the contents had PCB concentrations in excess of fifty ppm, for which disposal costs were significantly higher. Hatco solicited contract bids and ultimately disposed of the PCB-contaminated material with Chemwaste Management and

---

**15.** During this project, Hatco also incurred an additional and separate expense of $600, paid to Envirotech for arsenic, chromium and copper analyses of Ester II railroad ties. (Damages Stipulation ¶ 550)

its affiliate SCA Chemical Service. (Grassmyer Stipulation ¶¶ 34–37) The M tanks were then cleaned and decontaminated. (Cesareo Dep. 70)

203. Hatco incurred costs of $484,201.95 to decontaminate the M tanks and to sample and dispose of the PCB-contaminated tank contents. (Damages Stipulation ¶¶ 317–33)

### 8. Management Time and Attorneys' Fees

204. Hatco incurred $4,100 in costs for the management time of Hatco personnel on Projects 50 and 51 and on the disposal of PCB-contaminated material from the EPT plant. (Damages Stipulation ¶ 189)

205. Between September 1991 and November 1992, Hatco incurred legal fees of $2,446.35, paid to the law firm of Herold & Haines for services in connection with Projects 50 and 51 and the disposal of PCB-contaminated material from the EPT plant. (Damages Stipulation ¶¶ 185–88; Reitano Stipulation ¶¶ 1–4) [16]

206. Between November 1991 and March 1992, Hatco incurred legal fees of $19,826.12, paid to Lowenstein, Sandler, Kohl, Fischer & Boylan ("Lowenstein, Sandler") for assistance with the ACO II. (Damages Stipulation ¶¶ 547–48; Rodburg Stipulation ¶ 3)

### 9. DRAI Fees

207. In connection with the NJPDES permit, Hatco retained DRAI to provide advice on the remediation work to be done at the site and to implement DEP requirements pursuant to a work plan between Hatco and DRAI. (1443:5–10 (Chryss))

208. In early 1986, DRAI conducted the last sampling of the five-year program under ACO I. (1448:19–24 (Chryss)) The results were provided to DEP. (E1023; E1030).

209. DRAI also installed additional groundwater wells and undertook a soil sampling program in order to investigate and evaluate the former pond and muck storage areas (AEC 2), the lagoons (AEC 1), the PA Disposal Area (AEC 7A), and the Naphthalene Disposal Area (AEC 14). (Stipulation No. 42)

210. On September 23, 1986, DRAI submitted to Hatco the results from the sampling at the site. (E1038)

211. The NJPDES permit required Hatco to install downgradient monitoring wells, sample discharges to groundwater, propose a soil boring plan to identify lagoons, propose a closure plan for the active lagoons and assess Crows Mill Creek for contamination. (E1070)

212. In July 1987, DRAI prepared a proposed work plan designed in response to the NJPDES permit. The plan was submitted to DEP. (E1083; E1087)

213. Between November 16, 1987 and November 25, 1987, on DEP's instruction, Hatco installed six additional on-site monitoring wells. (E1124; E1188 at H510679)

214. On December 14, 1987, DRAI collected water samples from Sling Tail Creek and from the tributary to Crows Mill Creek, which were tested for BNs and VOCs. (E1188 at H510680–83, 510697–99)

215. In December 1987, DRAI took soil samples to delineate the lateral extent of the former ponds. DRAI also collected soil samples from the same area for PCB analysis. (E1188 at 510680–81)

216. On December 16, 1987, DRAI submitted a proposed addendum to the earlier work plan. DRAI sought approval from DEP for additional work, including completion and sampling of backhoe excavation in the former ponds area, subsurface explorations, and sampling in the former ponds area and in the existing lagoons. (E1140)

217. In 1987 and 1988, DRAI performed initial subsurface investigations in the western portion of the facility, including the completion of six soil borings and forty test pits in the former ponds area and six borings in each of the existing lagoons. (E2253 at DR801181A)

---

**16.** Hatco also incurred legal fees in connection with the PA Response Action. (Damages Stipulation ¶¶ 339, 341, 351) These fees have been included in the total costs incurred during the PA Response Action.

218. DRAI produced a grid system in order to conduct its investigation. The combined grid includes sampling performed in 1987 and 1988, a second round of sampling in 1988, and a third round of sampling taken as part of the RI work in 1992. (64:2–65:22 (Raviv))

219. In March 1988, DRAI performed subsurface investigations in the PA Disposal Area (37 borings) and in the western portion of the site (109 borings), including the former ponds area. (E2253 at DR801182A) DRAI took additional sediment samples from intervals along Sling Tail Creek and Crows Mill Creek. (E2253 at DR801182A)

220. In 1990, DRAI installed additional groundwater monitoring wells (66:19–20 (Raviv))

221. DRAI investigation at the site provided the means to chart groundwater flow and plumes in order to identify the areas of groundwater contamination. (210:23–211:16 (Raviv))

222. In January and February 1991, DRAI investigated the soil in the Ester I tank farm area, completing further soil borings and collecting samples at locations in the area. (E2253 at DR801182A)

223. In April and May 1992, DRAI performed RI/FS scoping activities, including soil and groundwater sampling and the monitoring of Wells 7D, 13S, 14S, 15S, 16D, 16B, 17S, 18S and 19S. (E2253 at DR801188A)

224. This Court previously determined that Hatco had incurred $668,975.43 in recoverable costs for services rendered by DRAI between July 1986 and June 1990. *Hatco III*, 836 F.Supp. at 1086; *Hatco I*, 801 F.Supp. at 1328–29. $28,273.13 of these expenses involved the investigation of the Naphthalene and PA Disposal Areas. $598,-354.93 of these fees were incurred in connection with the monitoring program under the NJPDES permit. The balance of fees was associated with non-remediation projects. (E8116)

225. Between October 1988 and August 1993, Hatco incurred additional expenses of $830,313.56 for services rendered by DRAI, including:

(a) $15,323.60 for investigation of the PA Disposal Area (Damages Stipulation ¶¶ 192–93);

(b) $4,156.88 for implementation of the excavation of the PA Disposal Area (Damages Stipulation ¶¶ 200, 206, 214);

(c) $196,323.14 for continuation of the groundwater sampling ordered by DEP in 1979 and expanded under the NJPDES Permit (Damages Stipulation ¶¶ 191, 194–95, 197–99, 202, 205, 209–10, 212–14, 216, 218, 222, 225–29, 231, 233, 235, 237, 240–41, 345–47, 251–53, 260, 266–67, 270);

(d) $16,629.87 for Project 50 investigation (Damages Stipulation ¶¶ 201, 203–04);

(e) $13,286.68 for Project 50 implementation (Damages Stipulation ¶¶ 207–08, 211, 259, 261);

(f) $43,120.52 for Project 51 investigation (Damages Stipulation ¶¶ 248, 256, 264, 275–78);

(g) $23,749.77 for sampling and characterization of sludge and soils generated by Project 50 (Damages Stipulation ¶¶ 215, 217, 219–21, 223–24, 226, 230, 232, 236, 244, 255, 280);

(h) $473,555.99 for the RI and other investigation in accordance with ACO II (Damages Stipulation ¶¶ 234, 238–39, 242–43, 249–50, 257–58, 262–63, 265, 269, 271–74, 281–83, 286–93, 295, 297–99);

(i) $2,046.74 for sampling and characterization of contaminated soil excavated during the repair of the Ester II railroad siding (Damages Stipulation ¶ 279);

(j) $17,201.82 for maintenance and inspection of the recovery system in Well 15S (Damages Stipulation ¶¶ 311–16; Trela Stipulation ¶¶ 107–13);

(k) $16,200.64 for review and comment on the draft ACO II in 1991 (Damages Stipulation ¶¶ 300–10; Trela Stipulation ¶¶ 115–28); and

(*l*) $8,717.91 for reviewing status of ongoing investigatory and remediation projects (Damages Stipulation ¶¶ 194, 252, 266, 282–83, 294, 296).

226. Hatco's request for DRAI fees does not include time spent by DRAI principals and employees on matters concerning (a) the

litigation between Grace and Hatco or (b) Hatco's effort to sell the site in 1988 and 1989. (Raviv Stipulation ¶¶ 19–21; Trela Stipulation ¶ 132)

## II. CONCLUSIONS OF LAW

### A. Count One—Hatco's Claim Under CERCLA

#### 1. Elements of Hatco's Prima Facie Case

1. Section 107(a) of CERCLA, in relevant part, provides:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
>    \*     \*     \*     \*     \*     \*
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ...
>
>    \*     \*     \*     \*     \*     \*
>
> from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>
>    \*     \*     \*     \*     \*     \*
>
> (B) any ... necessary costs of response incurred by any ... person consistent with the national contingency plan.

42 U.S.C. § 9607(a).

■ 2. In *Hatco III*, the Court set forth the four-part standard by which Hatco established Grace's liability for response costs under section 107(a). Hatco must show that: (1) that the Hatco property is a 'facility;' (2) that a 'release' or 'threatened release' of a hazardous substance from the Hatco property has occurred; (3) that a release or threatened release of hazardous substances has caused Hatco to incur 'response costs;' and (4) that Grace 'owned or operated' the Hatco facility at the time that any hazardous substances were disposed of on that site.

*See Hatco I*, 801 F.Supp. at 1328 (citing *T & E Indus. v. Safety Light Corp.*, 680 F.Supp. 696, 708 (D.N.J.1988)).

3. PCBs and K024 are designated "hazardous substances" under CERCLA. *See* 42 U.S.C. § 9601(14); 40 C.F.R. §§ 302.4 and 401.15.

■ 4. Defendant Grace owned and operated the Fords property between 1959 and 1978. The K024–producing PA plants ceased operation in 1971. Grace—unlike Hatco—utilized PCB products in its manufacturing processes at the site. Thus Grace fits the statutory definition of a covered person. *See* 42 U.S.C. § 9607(a); *Hatco III*, 836 F.Supp. at 1086.

■ 5. The site at issue is a "facility" under CERCLA, 42 U.S.C. § 9601(9)(B), since it is a "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *See id*, 801 F.Supp. at 1328.

6. Releases and threatened releases of PCBs and K024 were occurring at the site. *See Hatco III*, 836 F.Supp. at 1086.

7. The releases and threatened releases of hazardous substances have caused Hatco to incur response costs in excess of $10 million, including over $5 million for monitoring, assessing, evaluating, excavating and the offsite landfilling of the PA Disposal Area.

8. This Court previously assigned to Grace responsibility for most of the PCB contamination site-wide and for all the contamination at the PA and Naphthalene Disposal Areas. *Hatco III*, 836 F.Supp. at 1064–76.

9. Having proven the required elements of a prima facie case, Hatco must also show that its response costs were necessary and were incurred in compliance with the NCP. *See Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1219 (3d Cir. 1993). *See also Hatco III*, 836 F.Supp. 1089; *Hatco I*, 801 F.Supp. at 1328.[17]

---

**17.** In *Lansford–Coaldale*, the Third Circuit expressly indicated that NCP compliance and necessity of expense is an element of plaintiff's case for "recovery" of costs. 4 F.3d at 1219. The court left open the question whether the issue of necessity and NCP compliance could properly be considered during the damages, rather than the liability, phase of the trial. *Id.* at 1226 n. 20.

## 2. The NCP

10. Created by a group of federal agencies in 1968, the first NCP was designed with an eye toward environmental disasters. *State of Ohio v. EPA,* 997 F.2d 1520, 1525 (D.C.Cir.1993). Congress subsequently incorporated the NCP into the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376. *Id.* The NCP was revised several times during the 1970's, but was applied only to discharges into waters regulated under the Clean Water Act. *Id.* Following the enactment of CERCLA in 1980, the NCP was revised in 1982 ("1982 NCP"). 47 Fed. Reg. 31,180 (1982). EPA made subsequent revisions in 1985 ("1985 NCP"). 50 Fed.Reg. 47,912 (1985). After Congress passed the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), the NCP was revised again in 1990 ("1990 NCP") to reflect the changes in CERCLA. 55 Fed.Reg. 8,666 (1990).

11. "The NCP ... is a rule that presents ... [a] general plan or framework for responding to hazardous substances releases. The NCP is not intended to provide complex and detailed site-specific decisionmaking criteria." 50 Fed.Reg. 47,912, 47,920 (1985).

12. Courts evaluate the responding party's costs "against the NCP in force at the time that such costs were incurred." *Reading Co. v. City of Philadelphia,* 823 F.Supp. 1218, 1239 (E.D.Pa.1993). As determined in *Hatco I,* the Court will apply the 1985 NCP to the PA Response Action. 801 F.Supp. at 1331. As to Projects 50 and 51, the Court will apply the 1990 NCP, which was in force for the duration of Project 50 and from the inception of Project 51.[18]

█ 13. A party seeking recovery of response costs under section 107 of CERCLA bears the affirmative burden of proving that the response costs were necessary and were incurred in substantial compliance with the terms of the NCP. *Artesian Water Co. v. New Castle County,* 659 F.Supp. 1269, 1292 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir. 1988). *See also Hatco I,* 801 F.Supp. at 1332–33 (substantial, not strict, compliance with the 1985 and 1990 NCP is a prerequisite for recovery of response costs).

14. Grace asserts that Hatco has not satisfied its NCP burden with respect to the PA Response Action and Projects 50 and 51. Therefore, the Court should not allow Hatco to recover from Grace the costs incurred to implement these response activities.

### a. Removal Actions or Remedial Actions?

15. CERCLA delineates two types of response actions for which costs may be recovered: removal actions and remedial actions. 42 U.S.C. § 9601(23)–(24). The NCP also reflects this distinction and sets forth separate sets of compliance provisions for removal actions and for remedial actions. *Hatco I,* 801 F.Supp. at 1331–32.

16. CERCLA defines a removal action, in part, as

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary ... in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23).

17. CERCLA defines remedial actions, in part, as

---

18. The 1990 NCP became effective on April 6, 1990. The Court recognizes that site-wide PCB investigation had been instituted long before the 1990 NCP was promulgated. In view of this fact, the Court understands that under circumstances where clean-up was already underway prior to NCP revision, the revised NCP will apply, but only to the extent it does not impose new, more onerous burdens upon the party seeking cost recovery. *Tri–County Business Campus v. Clow Corp.,* 792 F.Supp. 984, 990–91 (E.D.Pa. 1992). With respect to Projects 50 and 51, the Court will not apply the 1990 NCP with such a limitation. Project 50 was instituted upon the unanticipated discovery of PCBs in Hatco's effluent in December 1990. Project 51 was implemented after Hatco discovered PCB seepage in June 1992 in the area of Warehouse No. 4.

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24).

18. As a matter of law, the Court must determine whether the PA Response Action, Project 50 and Project 51 were removal or remedial actions. *Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.,* 748 F.Supp. 373, 386 (E.D.N.C.1990). Grace asserts that these response actions constituted remedial actions. Hatco counters that they should be deemed removal actions. In the spirit of argument, both parties contend that the Court's determination will not affect the ultimate outcome. Whether the actions are deemed remedial or removal, Hatco asserts compliance with the NCP and Grace argues to the contrary.

19. The 1985 NCP dispensed with the distinction between immediate and planned removal actions which had existed under the 1982 NCP, 40 C.F.R. §§ 300.65–.67 (1984). Immediate removals were to be implemented in imminent, emergency situations. Planned removals involved less imminent releases, but rather threats of release. The EPA had concluded that the requirements for implementing immediate removals were consuming resources and effecting delays in necessary responses. 50 Fed.Reg. 5,862, 5,863 (1985).

20. The 1985 NCP standard for removal actions was designed to encompass all circumstances which would have been addressed either as immediate or as planned removal actions under the 1982 NCP. *Id. See also* 40 C.F.R. §§ 300.65–.67 (1984) (immediate removals were directed to immediate and significant risks to health and environment; planned removals were authorized where there was a risk of exposure to public health or the environment if response was delayed).

21. Promulgated, among other reasons, to clarify the 1985 NCP, the 1990 NCP maintained the single, overarching definition for removal action. 40 C.F.R. 300.415 (1990). "Any person may undertake a response action to reduce or eliminate the release or threat of release of hazardous substances, or pollutants or contaminants." 40 C.F.R. § 300.71(a)(1) (1985). *Accord* 40 C.F.R. § 300.700(a) (1990) (altering 1985 NCP language to say "threat of release of a hazardous substance, or pollutant or contaminants"). NCP removal provisions also state that "the lead agency may take any appropriate action to abate, minimize, stabilize, mitigate, or eliminate the release or threat of release . . . ." 40 C.F.R. § 300.65(b)(1) (1985). *Accord* 40 C.F.R. § 300.415(b)(1) (1990) (altering 1985 NCP language to say "may take any appropriate removal action").

■ 22. Generally stated, removal actions are designed for short-term or interim cleanup measures, and remedial actions involve long-term or permanent measures. *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 259 n. 10 (3d Cir.1992); *Hatco I,* 801 F.Supp. at 1331–32. Given the emphasis on long term and permanence, remedial actions are the subject of more extensive compliance provisions under the NCP than are removal actions. *Hatco I,* 801 F.Supp. at 1332.

23. However, a removal action is not converted into a remedial action just because it effects a permanent remedy. *General Elec. Co. v. Litton Indus. Automation Sys.,* 920 F.2d 1415, 1419 n. 4 (8th Cir.1990) (rejecting argument that "an excavation that totally and permanently cleans up a hazardous waste site never can be classified as a removal action"), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1390 (1991). *See also U.S. Steel Supply Inc. v. Alco Standard Corp.,* No. 89–20241, 1992 WL 229252, at *10 (N.D.Ill. Sept. 9, 1992).

■ 24. A response action may constitute both a removal and a remedial action, and a court is not constrained to find either term applicable at the expense of the other. *General Elec.,* 920 F.2d at 1419–20; *BCW Assocs., Ltd. v. Occidental Chem. Corp.,* No. 86–5947, 1988 WL 102641, at *18 (E.D.Pa. Sept. 29, 1988) (concluding that "[t]here is . . .

some overlap between the definitions" of removal and remedial actions).

25. The CERCLA definitions cited above provide examples of removal and remedial activities. The term remedial might include many of the measures implemented during Projects 50 and 51 or the excavation, "offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials." 42 U.S.C. § 9601(24). The definition of removal contains no such excavation and disposal example. *See* 42 U.S.C. § 9601(23). Nor does it cite as an example any of the measures taken during Projects 50 and 51. *Id.*

26. However, CERCLA does not, by its terms, provide an exhaustive list of activities for either type of response. *See* 42 U.S.C. § 9601(23)–(24). Excavation and offsite transport of a hazardous waste[19] may be characterized as a removal action. *General Elec.*, 920 F.2d at 1419; *BCW Assocs,* at *18 (concluding that "off-site actions are more easily characterized as removal actions"). The 1985 NCP lists the "removal of contaminated soils" as an appropriate removal activity. 40 C.F.R. § 300.65 (1985).

■ 27. To determine whether Hatco's response activities should be construed as removal actions under the NCP, the Court looks for guidance from the following factors: (a) the nature of the action taken; (b) the imminence of the release or threatened release; (c) whether a federal or state agency has found the existence of a threat to public health and safety or to the environment, (d) whether an agency has recommended a course of action to eliminate the threat and (e) the costs, complexity and duration of the activity. *See U.S. Steel Supply,* at *10.

■ 28. Upon considering the foregoing factors, the Court finds that the PA Response Action constituted a removal action under CERCLA and the 1985 NCP. In making this determination, the Court places significant weight upon the fact that the release of K024 was not only imminent, but actually occurring—the approximately 5,000 tons of PA still bottoms deposited in the PA Disposal Area were leaching K024 into Sling Tail Creek and into the groundwater, a potential source of drinking water.

29. The Court recognizes that neither EPA nor DEP had identified the K024 threat, much less made any recommendation concerning remediation. In addition, the Court notes that the great cost and tonnage involved in the project belie a removal characterization. However, the Court finds that the enormous quantity of waste materials in fact warranted a removal action, given the hazardous qualities of K024. Moreover, the cost and the tonnage of material should not overshadow the relative simplicity of the task: the 400 by 300 foot area of contamination was visually identifiable and the excavation and disposal was completed in just over a month.

30. The Court also finds that the measures comprising Projects 50 and 51 are properly deemed removal actions under CERCLA and the 1990 NCP. Projects 50 and 51 were implemented during the formulation of a plan to remediate the entire site. With the objective of protecting the environment and reducing exposure to workers at the site, Projects 50 and 51 entailed interim measures designed to stabilize actual releases of PCBs and to prevent future releases.

#### b. The PA Response Action

#### (1) Motives and Intent

■ 31. Before analyzing the PA Response Action against the 1985 NCP requirements, the Court is compelled to address two issues preliminarily: (1) Hatco's motives for remediating the PA Disposal Area, and (2) Hatco's failure to consider the NCP during the PA Response Action.

32. Grace suggests that Hatco may not recover the costs of the PA Response Action because the contemplated sale to Exxon mo-

---

**19.** K024 is not only a hazardous substance under CERCLA, but EPA has also identified it as a hazardous waste. 40 C.F.R. § 261.32. EPA generally only lists as hazardous, specific wastes that are either "acutely toxic or possess high levels of toxic constituents." *Chemical Waste Management, Inc. v. EPA,* 976 F.2d 2, 7–8 (D.C.Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1961, 123 L.Ed.2d 664 (1993).

tivated Hatco to act. The Court rejects this legal proposition and considers Hatco's motives irrelevant for the purposes of determining response cost recovery. *See General Elec.*, 920 F.2d at 1418 (finding that "[t]he motives of the private party attempting to recoup response costs under 42 U.S.C. § 9607(a)(4)(b) are irrelevant"), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991); *Channel Master*, 748 F.Supp. at 379 n. 7; *BCW Assocs.*, 1988 WL 102641, at *17. A party may be motivated by any number of objectives when undertaking a response action. The requirements of the NCP sufficiently safeguard against meritless cost recovery proceedings. The Court will not find lack of NCP compliance simply on grounds that the contemplated sale to Exxon hinged upon remediation of the PA Disposal Area.

■ 33. The Court adopts a similar rationale regarding Hatco's failure to acknowledge or address the NCP during the PA Response Action. Hatco's admission of neglect cannot be viewed as dispositive on the issue of NCP compliance. Substantial compliance is the touchstone for cost recovery. Hatco's intent—like motive—may be illuminating, but not by itself dispositive, on the question of NCP compliance.

### (2) Question of Compliance—1985 NCP Removal Provisions

#### (A) Propriety of a Removal Action—Assessment

34. "Except as provided in section 300.71, nothing in [the 1985 NCP] limits the rights of any person to seek recovery of response costs from responsible parties pursuant to CERCLA section 107." 40 C.F.R. § 300.-61(e)(2) (1985).

35. With an exception not relevant here, the 1985 NCP provides that to recover costs from responsible parties under CERCLA § 107, a private party's "response action will be consistent with the NCP[,]" and if a removal action, it must be "consistent with § 300.65 [of the NCP]." *Id.* § 371(a)(2)(i).

36. Turning to the provisions of section 300.65, the Court notes that "any action to be taken by the 'lead [or government] agency' in § 300.65 *may* be taken by the person carrying out the response." *Id.* § 300.71(a)(3) (emphasis added). The Court not only finds this provision relevant to the standard of substantial compliance, but construes it as according private parties even greater latitude when their response actions are scrutinized under NCP requirements. What is mandatory for a government agency may not be mandatory for a private party depending upon the circumstances.

37. To determine the appropriate response to a release or threat of release, the 1985 NCP requires that "the lead agency shall first review the preliminary assessment and the current site conditions to determine if a removal action is appropriate." *Id.* at § 300.65(a)(1). To determine the propriety of a removal action, the responding party shall consider the following factors under section 300.65(b)(2) (the "removal action factors"):

(i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals or food chain;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release;

(viii) Other situations or factors which may pose threats to public health or welfare or environment.

*Id.* § 300.65.(b)(2)(i).[20]

38. With respect to a preliminary assessment, Grace argues that Hatco was not in substantial compliance with section 300.64. This provision of the 1985 NCP, entitled "Preliminary assessment for removal actions," details certain steps that might be undertaken in preparing a preliminary assessment of a release or threat of release. However, the Court, for two reasons, questions whether this provision is applicable to Hatco. First, a preliminary assessment does not appear mandatory as the provision states that a preliminary assessment "shall, *as appropriate,* be undertaken...." *Id.* § 300.-64(a) (emphasis added). Second, the Court recognizes that the NCP provision governing cost recovery for private parties does not cross-reference section 300.64, but directs responding parties to section 300.65 only. *See id.* § 300.71(a)(2)(i). In turn, section 300.65 does not reference section 300.64. Therefore, failure to comply substantially with section 300.64 would not preclude a private party from recovering costs under section 107 of CERCLA.

39. Even if section 300.64 were pertinent to the question of private-party cost recovery, the Court finds Hatco in substantial compliance with this provision. Section 300.64 provides that a preliminary assessment may include "collection or review of data such as site management practices, information from generators, photographs, analysis of historic photographs, literature searches, and personal interviews conducted where appropriate." *Id.* § 300.64(b) Hatco did consider site management practices, aerial photographs, historical records and the knowledge of personnel familiar with the attributes and disposal of the PA still bottoms. Hatco knew that 5,000 tons of PA still bottoms had been dumped in the PA Disposal Area and that K024 had moved into the groundwater. In this context, the Court finds Hatco's preliminary assessment sufficient under the 1985 NCP.

40. Turning to the removal action factors, the Court notes that Hatco need not have addressed each one specifically. *See General Elec.,* 920 F.2d at 1420. Moreover, certain of the factors may not be pertinent depending upon the circumstances present. Here, for example, fire or explosion was not a risk associated with the PA Disposal Area. *See U.S. Steel Supply,* 1992 WL 229252, at *18 (no need to consider risk of fire or explosion where no risk is present). On the question of compliance, the Court must consider the removal action factors in the context of Hatco's activities and determine whether Hatco had properly ascertained the existence of a "threat to public health or welfare or the environment." 40 C.F.R. § 300.65(b)(2) (1985).

41. Through examination of the removal action factors, the Court is satisfied that Hatco had sufficient evidence at hand to conclude that a removal action was appropriate for the PA Disposal Area. Hatco had linked groundwater contamination to the K024 in the PA Disposal Area and recognized the threat to Sling Tail Creek. Hatco chemists and personnel were familiar with the nature and extent of the toxic K024 waste in the PA Disposal Area. Drums containing phthalic anhydride were found in the area. Testing and visual discoloration of surface soil indicated the presence of K024 waste with the potential for migration.[21] Based on these considerations, the Court finds that Hatco—irrespective of intent—substantially complied with section 300.65(a)-(b) of the 1985 NCP in determining that a response action (here, a removal action) was appropriate.

20. Factor (vii) of section 300.65(b)(2) does not apply to a removal action instituted by private parties. 40 C.F.R. § 300.65(i).

21. While Hatco's TIC readings at the time of excavation did not provide accurate concentration levels, they did affirm the presence of K024. The Court notes that neither CERCLA nor the NCP requires the responding party to ascertain specific concentration levels of the identified contaminant prior to implementing a response action. While concentrations levels may provide insight regarding the extent and nature of the threat, Hatco's failure to fix K024 concentration levels will not foreclose NCP compliance. *See United States v. Alcan Aluminum Corp.,* 755 F.Supp. 531, 543 (N.D.N.Y.1991), *aff'd,* 990 F.2d 711 (2d Cir.1993).

42. The Court's conclusion that the PA Response Action constituted a removal action is supported by measures which might be employed during a removal action. There are no limitations regarding the type of actions a private party may institute. The NCP provides examples—not an exhaustive list—of removal activities, including: (a) erection of warning signs or fences to impede access to the release area, (b) installation of drainage controls to control run-off, (c) stabilization of berms and dikes to maintain structural integrity, (d) the capping of soil to reduce migration of contaminants, (e) chemical treatment to retard migration, (f) removal of highly contaminated soils from drainage or other areas to reduce migration, (g) removal of drums or containers to reduce potential for spills or leaks, and (h) provision of an alternative water supply to reduce exposure of animals and humans to pollutants. *Id.* § 300.65(c)(2).

### (B) Alternatives and Costs

43. Section 300.65 does not contain a provision which requires the responding party to assess alternative response strategies for cost-effectiveness. However, the Court notes that the NCP's list of removal action factors and generally accepted removal activities do not exhaust "the factors and alternatives that must be considered in the removal process." 50 Fed.Reg. 47,912, 47,930 (1985). In addition, the EPA intended that costs be considered "for determining the appropriate method of removal." *Id.*

44. While the EPA intended that responding parties consider alternative response strategies, the nature and extent of such consideration is dependent upon the circumstances which require the removal action. *See BCW Assocs.,* 1988 WL 102641, at *20 (concluding that responding parties' "assessment of the threat posed by the [contaminant] and their consideration of alternative response strategies were relatively simple, but the nature of the situation warranted no more"). In addition to excavation, Hatco did consider other measures to treat the PA Disposal Area, including capping, solvent extraction techniques, onsite recycling and physical screening technologies. Hatco rejected the alternatives based upon an assessment of cost-effectiveness.

45. At the forefront of Hatco's costs concerns was the proposed regulation, issued by EPA on April 8, 1988, which proscribed the land disposal of certain hazardous wastes, including K024, effective August 8, 1988.[22] 53 Fed.Reg. 11,742. This proposed regulation contained a two-year variance for K024.

46. On May 17, 1988, EPA issued another proposed land ban regulation, which dropped the two-year variance for K024. However, recognizing that existing incineration capacity was inadequate, EPA proposed a two-year variance for soils contaminated with K024. 53 Fed.Reg. 17,578, 17,611, 17,624 (1988) (proposed 41 C.F.R. § 238.33(a)). With the goal of clarifying the proposed soil variance, EPA solicited public commentary in order to define contaminated soil, specifically whether the variance should apply to soils mixed with waste. *Id.* at 17,613.

47. Hatco carefully monitored developments relating to the proposed land ban and variance and even sought EPA guidance. Until publication of the final regulation on August 17, 1988, Hatco was unable to ascertain whether the materials in the PA Disposal Area would be subject to the land ban or a variance. In the final regulation, EPA announced that contaminated soils subject to the variance would be identified on a case-by-case basis. 53 Fed.Reg. 31,138, 31,196–97, 31,217 (1988). By the effective date, August 8, 1988, Hatco had nearly completed the ex-

**22.** After the effective date of the regulation, EPA would identify fluidized bed and rotary kiln incineration as the best demonstrated available technology ("BDAT") for treating K024. 53 Fed. Reg. 11,742, 11,757 (1988). EPA studies indicated that incineration would effectively reduce K024 concentration levels to 6 mg/kg. Accordingly, the proposed regulation required that, prior to land disposal, nonwastewater K024 concentration levels had to be reduced to 6 mg/kg. In other words, the proposed regulation prohibited land disposal of nonwastewater K024 with concentration levels in excess of 6 mg/kg. 53 Fed. Reg. at 11,789 (proposed 41 C.F.R. § 268.43). Apparently, EPA reached the 6 mg/kg standard through a calculation error, which was corrected in the final regulation. Ultimately, the land ban would apply, in effect, to nonwastewater K024 with concentration levels in excess of 28 mg/kg. 40 C.F.R. § 268.33(g) (1988).

cavation and off-site disposal of the materials from the PA Disposal Area.

48. After carefully assessing the impact of the land ban, the Court must consider two separate and distinct issues. First, whether CERCLA and the NCP would have allowed Hatco to factor the land ban into its decision concerning the propriety of a removal action. Second, whether, on the question of NCP compliance, the Court should view the land ban as a pertinent factor in the cost-effectiveness equation.

49. Grace conflates the two issues by asserting that Hatco's cost-effectiveness analysis was deficient for excluding proper consideration of a "no-action" alternative to excavation. In essence, Grace argues that a wait-and-see strategy may have proved more cost-effective than a rushed, pre-land ban excavation and disposal project. In Grace's scenario, Hatco takes no action until the land ban is promulgated in final form. If the variance applies, Hatco may do nothing, the pressure is removed to act quickly. If the variance is inapplicable, then Hatco must finalize testing in the area to determine whether K024 concentration levels implicate the land ban's prohibition. *See supra* note 22.

■■■■ 50. The Court rejects Grace's argument. In raising the question of cost-effectiveness, Grace conveniently ignores the premise that Hatco had already deemed appropriate some type of response action. The "no-action" alternative is relevant only to that phase of analysis in which the party must determine if any action, removal or remedial, is required at all. Once the party ascertains a need for action, the "no-action" alternative is no longer an alternative.

51. The issue before the Court is not whether Hatco acted imprudently or chose the best available treatment alternative, but whether Hatco substantially complied with the NCP. In that regard, the Court is more interested in the pressures and conditions of the moment in which Hatco acted, rather than the cool and rational reflections of hindsight. From the time it was proposed, to the date it was promulgated, the land ban and its potential effects could not be ignored. Hatco was under enormous time and fiscal pressures to implement a response action. Grace's suggested wait-and-see approach could have cost Hatco, and conceivably Grace, tens of millions of dollars if the variance proved to be inapplicable and the K024 concentration levels proved to be prohibitive of land disposal. A removal action was required. There was nothing to be gained by delay. Only the prospect of spending millions of more dollars to remediate the PA Disposal Area at a later date loomed on the horizon. Moreover, even while Hatco considered excavation, land disposal costs were rising and would continue to rise after the land ban went into effect. Regardless of the land ban's applicability to the PA Disposal Area, delay in excavation would bring an increase in response costs. The Court concludes that Hatco performed prudent cost analyses by considering the potential effects of the land ban.

52. The Court cautions, however, that Hatco's decision to institute a removal action could not be countenanced if based solely upon the potential cost ramifications of the impending land ban. The EPA expressly warns that under CERCLA, costs cannot be considered in determining whether a response is appropriate. 50 Fed.Reg. 47,912, 47,930 (1985). Nonetheless, here the Court cannot discount the ambiguity and time pressures associated with the land ban when evaluating Hatco's failure to prepare a final and thorough assessment of the PA Disposal Area prior to implementing the removal action.[23]

53. In any event, to the extent the NCP requires the responding party to consider the cost-effectiveness of alternative response measures, the Court is satisfied that Hatco substantially complied, particularly with re-

---

**23.** The Court is disturbed by the fact that Hatco did not pin down accurate K024 concentrations prior to excavation and the imposition of the land ban. As of April 8, 1988, Hatco was aware that the proposed regulation contemplated a prohibition against land disposal of nonwastewater K024 with concentration levels in excess of 6 mg/kg. Despite this knowledge, Hatco never collected accurate data on K024 concentrations until after excavation and disposal. Failure to collect such data will not, by itself, preclude cost recovery. *See supra* note 21.

spect to the potential ramifications of the land ban.

### (C) Community Relations, ARARs and Cost Documentation

■ 54. Grace also asserts that Hatco must have substantially complied with section 300.67, which requires the lead agency instituting a removal action to develop a community relations plan to advise the public of the prospective activity and of the opportunity to comment. Given that private-party cost recovery is dependent upon substantial compliance with section 300.65 alone, any failure by Hatco to comply with the community relations provision would not preclude recovery. *See id.* § 300.71(a)(2)(i).

55. Even if Hatco's CERCLA claim implicates section 300.67, the Court finds that Hatco was in substantial compliance to the extent that cost recovery will not be disallowed. Where a removal action is to be completed in less than 45 days, the responding party may dispense with a formal community relations plan, including the appointment of a spokesperson. 40 C.F.R. § 300.-67(b). Excavation of the PA Disposal Area was completed in less than 45 days.

■ 56. In addition, the absence of public notice and an opportunity for public comment will not preclude cost recovery where the responding party notified the relevant regulatory agencies. *General Electric Co. v. Litton Business Sys., Inc.,* 715 F.Supp. 949, 961 (W.D.Mo.1989) (determining that notice to appropriate state agency satisfied any applicable public notice requirement for private parties under 1985 NCP), *aff'd,* 920 F.2d 1415 (8th Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1390 (1991). Hatco notified EPA and DEP of the K024 contamination and Hatco's desire to institute cleanup measures. Given the circumstances and context of this particular removal action, the Court is satisfied that Hatco complied substantially with the public notice requirement of section 300.67, if applicable to private party responses.

57. A private-party removal action must, where practicable, "attain or exceed applicable or relevant and appropriate Federal public health and environment requirements." 40 C.F.R. § 300.65(f). Where appropriate other federal or state standards should be considered. *Id. See also* 55 Fed.Reg. 8,666, 8,695 (1988) ("it has been EPA policy since the [1985 NCP], to attain ARARs during removals to the extent practicable, considering the exigencies of the situation"). Based on the record, the Court finds that Hatco satisfactorily considered and attained, to the extent required, the applicable ARARs, including federal and state cleanup regulations and New Jersey water quality standards.

58. Grace has also suggested that Hatco might have limited the action, excavating only the hazardous materials. However, the PA still bottoms and other wastes were admixed throughout the material comprising the PA Disposal Area. During the excavation, the EPA's "Mixture Rule," 40 C.F.R. § 261.3(a)(2)(ii) (1978) was still in effect.[24] Under the Mixture Rule, the presence of K024 hazardous waste in the soil material would have required Hatco to treat the excavated soil material as a hazardous waste. *See id.; Shell Oil,* 950 F.2d at 749.

59. Grace also asserts that Hatco did not substantially comply with section 300.69, which requires the lead agency to collect and maintain documentation during all phases of the response in order to establish a record concerning the circumstances of the conditions, the identity of responsible parties, costs incurred and the impact or threat to public health and welfare and the environment. 40 C.F.R. § 300.69 (1985). Given that private-party cost recovery is dependent upon substantial compliance with section 300.65 alone, any failure by Hatco to comply with the documentation provision would not preclude recovery. *See id.* § 300.71(a)(2)(i).

60. Even if Hatco's CERCLA claim implicates section 300.69, the Court finds that Hatco was in substantial compliance. The record reveals that Hatco maintained histori-

---

24. In 1991, the Circuit Court of Appeals for the District of Columbia vacated and remanded to EPA the Mixture Rule for lack of adequate notice and opportunity to comment. *Shell Oil Co. v. EPA,* 950 F.2d 741, 752 (D.C.Cir.1991).

cal documents, memorandum, photographs and evidence of costs incurred.

61. Based on the record, and having considered the applicable provisions of the NCP, the Court is satisfied that Hatco substantially complied with the 1985 NCP in undertaking and implementing the PA Response Action.

### c. Projects 50 and 51

■ 62. Hatco's cost recovery action for Projects 50 and 51[25] is governed by the 1990 NCP. *See supra* ¶ 11. Cost recovery is dependent upon a determination that Hatco substantially complied with applicable provisions of the 1990 NCP. *See* 40 C.F.R. § 300.700(c)(2)(i) (1990) ("[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements").

63. Various provisions of the 1990 NCP are "potentially applicable" to private parties who institute response actions, *see id.* § 300.-700(c)(5), including sections 300.410 and 300.-415, which specifically address removal actions.

64. To determine whether a removal action is appropriate, the lead agency must review any existing removal site evaluation produced under section 300.410, current site conditions and any other relevant information. *Id.* § 300.415. "A removal site evaluation includes a removal preliminary assessment, and if warranted, a removal site inspection." *Id.* § 300.410(a).

65. A removal preliminary assessment may include the identification of the source and nature of the release and threat, the evaluation of the magnitude of the threat, collection of data, and the review of site management practices and photographs. *Id.* § 300.410(c). Where the preliminary assessment fails to provide sufficient data, a removal site inspection may be performed and

might include, if safe, on-site and perimeter inspections. *Id.* § 300.410(d). Results of the removal site evaluation must be documented. *Id.* § 300.410(f).

66. Hatco conducted sufficient preliminary investigations into the releases triggering Projects 50 and 51. Based on the record, the Court finds that Hatco substantially complied with the 1990 NCP's provisions concerning removal site evaluation.

67. Like the 1985 NCP, the 1990 NCP lists a number of factors that must be considered by the lead agency in determining whether a removal action is appropriate. The Court does not construe this list to be exhaustive, and recognizes that in certain instances certain of the factors may not be relevant. Mirroring the 1985 NCP's removal action factors, the 1990 NCP factors include (a) exposure to humans or biota; (2) contamination of drinking water systems or sensitive ecosystems; (c) tanks or storage containers containing hazardous substances, pollutants or contaminants; (d) high concentration levels of contamination at or near the surface; (e) weather conditions that might effect migration or release; (f) threat of fire or explosion; and (g) other available response mechanisms. *Id.* § 300.415(b)(2)(i)–(viii).

68. The Court is satisfied that Hatco substantially complied with the NCP to the extent that it considered the existence of certain of the removal action factors, particularly the threat of PCB exposure to workers, the high concentration levels of PCBs at or near surface areas and the potential for weather conditions to transport PCBs.

69. The Court's conclusion that Projects 50 and 51 constitute removal actions is supported by the measures which might be employed during a removal action. The 1990 NCP, like the 1985 NCP, provides a list of potential removal actions that may be appropriate depending upon the existing circum-

---

25. Hatco concedes that Project 51 has not been completed. Grace asserts that the Court cannot properly determine NCP compliance until Project 51 is finished. On this point, Grace requests that the Court hold in abeyance all response costs for Project 51 until completion.

CERCLA provides that "an action may be commenced ... for the recovery of costs at any time

after such costs have been incurred." 42 U.S.C. § 9613(g)(2). Hatco may bring a recovery action for those costs already incurred during Project 51. The Court will address NCP compliance in connection with the associated response activities. Any recovery, at this juncture, would be limited to costs incurred.

stances. This list is not exhaustive and includes (a) erection of warning signs or fences to impede access to release area, (b) installation of drainage controls to control run-off, (c) stabilization of berms and dikes to maintain structural integrity, (d) the capping of soil to reduce migration of contaminants, (e) chemical treatment to retard migration, (f) removal of highly contaminated soils from drainage or other areas to reduce migration, (g) removal of drums or containers to reduce potential for spills or leaks, and (h) provision of an alternative water supply to reduce exposure of animals and humans to pollutants. *Id.* § 300.415(d)(1)–(9).

70. Unlike the 1985 NCP, the 1990 NCP contains provisions requiring the lead agency to develop some form of community relations plan in connection with a removal action. 40 C.F.R. § 400.415(m). The provisions are only "potentially applicable" to private-party responses. *Id.* § 300.700(c)(6). A spokesperson must be appointed as a liaison to the community. *Id.* § 300.415(m)(1). Where the activity is to begin within six months from when removal is deemed appropriate, the lead agency must publish notice concerning the availability of an administrative record and provide opportunity for public comment. *Id.* § 300.415(m)(2)(i)–(iii). Hatco substantially complied with these requirements during Projects 50 and 51.

71. The NCP imposes further community relations requirements where the removal activity is expected to extend beyond either 120 days or six months. *Id.* § 400.415(m)(3)–(4). The Court has made no finding as to Hatco's expectations, but is aware that Project 50 activities were completed in more than four months, and that Project 51 began in the summer of 1992 and continues to this day. Given the potential applicability of these provisions, the Court is satisfied that Hatco substantially complied with the requirements concerning the development of a community relations plan, public notice and the opportunity for comment. *Id.* at 300.-415(m).

72. To the extent that the 1990 NCP, like the 1985 NCP, requires the responding party to consider alternative response activities and relative cost-effectiveness, the Court is satisfied that Hatco substantially complied with these mandates.

73. Another potentially applicable provision to removal actions is section 300.150, which directs the responding party develop an occupational safety and health program at the site during the response action, which should be made available to workers at the site. *Id.* at § 300.150. In addition, the responding party must ensure that outside contractors comply with the requirements of the plan. *Id.* Hatco prepared and made available to workers a health and safety plan in conjunction with Projects 50 and 51. DRAI was hired to oversee the work of Hatco personnel and outside contractors. To the extent this provision is applicable to Projects 50 and 51, Hatco has substantially complied with it.

74. Another provision potentially applicable to Projects 50 and 51 is section 300.160, which provides that the responding party collect and maintain documentation that might form the basis of a cost recovery action by identifying the source and circumstances of a release, the potentially responsible parties, the response taken, the costs incurred or the impacts on the environment. *Id.* § 300.160. Hatco has maintained progress reports and adequately documented the circumstances, activities and costs of Projects 50 and 51. To the extent this provision applies to Projects 50 and 51, Hatco has once again substantially complied.

### 3. Necessary Response Costs

75. Liability under CERCLA encompasses all "necessary costs of response." 42 U.S.C. § 9607(a)(4)(B).

76. These necessary costs include expenses for investigating, testing, sampling and monitoring environmental contamination. *Hatco I,* 801 F.Supp. at 1328 (citing *Artesian Water Co. v. New Castle County,* 851 F.2d 643, 651 (3d Cir.1988))

77. Such costs take various forms and may include purchases of equipment to monitor and evaluate contamination, *see BCW Assocs.,* 1988 WL 102641, at *16, and management time, *T & E Indus.,* 680 F.Supp. at 706–07.

78. In *Hatco I*, the Court took a firm position on the recovery of attorneys' fees under CERCLA. The Court will not abandon that position here. However, *Hatco I* cannot be read too broadly. At that time, the Court was addressing recovery of attorneys' fees incurred during a civil action to recover response costs under CERCLA. *Hatco I*, 801 F.Supp. at 1333. The Court views differently nonlitigation attorneys' fees generated during the creation and negotiation of a response action and the preparation and implementation of a work plan which is approved by a government agency. *See FMC Corp. v. Aero Indus.*, 998 F.2d 842, 847–48 (10th Cir.1993). The Court adopts the Tenth Circuit's view that nonlitigation attorneys' fees may be recoverable if "neces-. sary to the containment and cleanup of hazardous releases." *Id.* at 848.

79. In conjunction with the rule concerning litigation and nonlitigation attorneys' fees, the Court draws a similar distinction (a) between data gathered for purposes of site investigation and data gathered for purposes of a cost recovery litigation; and (b) between consultants employed during site investigation and remediation and consultants employed as expert witnesses at a trial for recovery of remediation costs. Grace has requested that any recoverable DRAI fees be reduced because Hatco not only used the information gathered by DRAI to prepare this case for litigation, but also used DRAI consultants as expert witnesses at trial.

■■■ 80. Where an investigatory expense is incurred in response to contamination, it is irrelevant to cost recovery under CERCLA

that the information gathered during the investigation can then be utilized in a later cost recovery action. *HRW Sys., Inc. v. Washington Gas Light Co.*, 823 F.Supp. 318, 343 (D.Md.1993). In the same vein, while a consultant's fee would not be recoverable if incurred specifically for the services of an expert witness, the Court will not deny recovery of a consultant's fee incurred during an investigation or removal action merely because the personal knowledge gained by the consultant might enhance expert testimony given during a subsequent cost recovery action. Hatco does not seek recovery of any DRAI fees relating to the services of expert witnesses at trial. The Court will reject Grace's request to discount or reduce any DRAI fees that are recoverable otherwise.

■■■ 81. The Third Circuit's recent decision in *Lansford–Coaldale* suggests that NCP compliance is a requisite element for recovery of monitoring and evaluation costs. *Lansford–Coaldale*, 4 F.3d at 1219. Hence, the Third Circuit interprets CERCLA as providing for recovery of monitoring and evaluation costs where "(1) there was a reasonable risk (although one that may not materialize) that the defendant's release or threatened release of hazardous substances would contaminate the plaintiff's property; and (2) the monitoring and evaluation expenses were incurred by the plaintiff in a reasonable manner." *Id.* The Court concludes that Hatco's monitoring and evaluation costs satisfy these two requirements set forth in *Lansford–Coaldale*.[26]

82. Recoverable response costs may also include the indirect costs associated with the

---

26. After reading *Lansford–Coaldale*, the Court confesses concern over whether NCP compliance is a prerequisite for recovery of monitoring and evaluation costs. The Third Circuit expressly states this proposition, *see Lansford–Coaldale*, 4 F.3d at 1219, but does not explain further as to how the NCP, and any specific provisions therein, might be applied. In addition, the Court is cognizant of the view that the NCP provisions cannot reasonably be applied to preliminary monitoring and investigation and thus are inapplicable to those specific response costs. *Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 795 (D.N.J.1989). The court in *Lansford–Coaldale* stated that

[b]ecause a plaintiff must prove that the defendant was responsible for a release or threat-

ened release of hazardous substances and that the costs incurred in response were both necessary and consistent with the NCP, [the two requirements for recovery of monitoring and evaluation costs] prevent a plaintiff from recovering the costs incurred in instituting a needless and expensive monitoring study.
4 F.3d at 1219.

The two recovery requirements for monitoring and evaluation costs were established in conjunction with plaintiff's burden of NCP compliance. Therefore, to the extent monitoring and evaluation measures must comply with the NCP, the Court is satisfied that Hatco met the two *Lansford–Coaldale* requirements.

general operation of the response action. *United States v. Ottati & Goss, Inc.*, 900 F.2d 429, 444–45 (1st Cir.1990). Such indirect costs might include expenditures for "rent, utilities, administrative offices, personnel, supplies, and equipment...." *Kelley v. Thomas Solvent Co.*, 790 F.Supp. 719, 729 (W.D.Mich.1990). The Court concludes that Hatco may recover indirect costs, where assignable to Grace, for management and personnel time, and for the excavation and disposal of contaminated materials incident to the implementation of various removal activities.

83. While Hatco may derive future benefit from the replacement or improvement of equipment as part of the subject removal actions, the Court will not deny full recovery of these costs where it was reasonable to select such means for the response action. *See Phillips Petroleum Co. v. Stokes Oil Co.*, 863 F.2d 1250, 1257–58 (6th Cir. 1988). Given Hatco's substantial compliance with the NCP, the Court deems Hatco's equipment improvement or replacement costs reasonable for purposes of cost recovery.

84. During its disposition of Grace's counterclaim for contribution, the Court addressed the question of Hatco's tardiness in responding to the PCB contamination at the site. *See Hatco III*, 836 F.Supp. at 1091–92 (stating that Hatco should have commenced its remedial investigation in 1985, not 1988). Persuaded that Hatco's delay did not directly effect an increase in remediation costs, the Court declined to factor the delay into the apportionment of liability. *Id.* Because this contention has already been addressed by the Court in the equitable allocation of responsibility, Hatco's delay will not be reconsidered now in the Court's allocation of response costs. *See U.S. Steel Supply*, 1992 WL 229252, at *15 (delay in response may be a factor to be considered during apportionment).

## B. Count Four—Hatco's Claim for Contribution Under the New Jersey Spill Act

85. In *Hatco III*, the Court surmised that NCP compliance was a precondi-

tion for recovery on a contribution claim under the Spill Act. 836 F.Supp. at 1092–93. The Court withheld its decision on Hatco's Spill Act claim until the NCP compliance issues had been tried and resolved. *Id.* Hatco has vehemently argued that NCP compliance is not a prerequisite to contribution recovery under the Spill Act. Given the foregoing determinations of NCP compliance, the Court's construction of the Spill Act in relation to the NCP, is no longer relevant to the resolution of Hatco's claim. Questions concerning the Spill Act's incorporation of the NCP are better left for another day and another court. Any prior statement of this Court should be viewed as nonbinding. Hatco has successfully proved its contribution claim under the Spill Act.

## C. Allocation of Response Costs

86. To reiterate the liability determination in *Hatco III*, Grace is severally liable to Hatco for all necessary response costs incurred or to be incurred by Hatco for the remediation of the easternmost portion of the Fords site described by Hatco's expert as AECs 6, 7A, 10B, 10C, 14, and 21B. *Hatco III*, 836 F.Supp. at 1089. Grace is also liable to Hatco for any necessary response costs incurred or to be incurred by Hatco for the remediation of the contamination found in the areas of joint use, including hot spots, for which the Court allocated responsibility to Grace. *Id.*

87. Grace is jointly and severally liable to Hatco under section 107 of CERCLA for all necessary response costs incurred or to be incurred by Hatco for the remediation of metal contamination at the site. *Id.*

88. In addition, the Court has determined that Hatco may recover response costs under the Spill Act, which provides that, "in resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court deems appropriate." N.J.S.A. 58:10–23.11f. Given the effort in *Hatco III* to detail and assign culpability based upon the grounds of divisible harm and contribution, the Court concludes that Hatco would

be entitled to identical cost recoveries under both the Spill Act and CERCLA.

89. The Court immediately recognizes that certain of the remediation costs incurred by Hatco are not readily allocable via the existing apportionment mechanism—degree of culpability within a specific AEC. This recognition stems from two bases. First, the Court has not addressed liability for certain areas at the site which have generated remediation costs for which Hatco now seeks recovery. Specifically, the Court must assign liability for the PCB contamination in the sewer system, the EPT plant and the effluent before allocating the related response costs. The Court will address this problem before it allocates these costs below.

90. A second, less tractable problem surrounds certain response costs which seem to defy allocation under the existing apportionment framework. Certain costs associated with DEP oversight just simply cannot be assigned easily to a specific AEC and then divided according to culpability. The Court treads carefully here because these types of costs will be recurring as remediation at the site progresses.

91. The Court underscores that this action involves not only Hatco's cost recovery claims, but also Grace's counterclaim for contribution. The Court identified those equitable factors it considered relevant to Grace's counterclaim and concluded that these factors had already been considered in the Court's apportionment of liability. *Hatco III*, 836 F.Supp. at 1090–92. As a consequence, the Court apportioned liability in the AECs of joint use and contamination. However, where strict apportionment of harm impedes the allocation of costs which are generally applicable to site-wide efforts, the Court turns to CERCLA's contribution provision which states that "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

92. Given that activities during Grace's ownership were the driving force for DEP oversight on the heels of Hatco's purchase of the site, Grace will be held fully responsible for ACO-related costs incurred before the end of the ACO I's five-year program in 1986. After 1986, the Court is convinced that some different type of allocation is required based upon Hatco's detection of PCBs in April of 1985 and consequent delay in the handling of the lagoons until 1991. The Court finds that such costs will be allocated on the following percentage basis, 90.5% to Grace and 9.5% to Hatco (the "overall site-wide percentages"). These figures reflect the average of each party's share of the total volumes of soil contaminated with PCBs, BNs and VOCs, as set forth in Appendix 4 of *Hatco III*, 836 F.Supp. at 1098.[27] In those instances where it is impracticable to allocate costs by AEC and type of contaminant, the Court will utilize these percentages for costs incurred after 1986 and the conclusion of the first five-year sampling program under ACO I.

### 1. PA Response Action

93. This Court previously determined that Grace was 100% responsible for the contamination in the PA Disposal Area (AEC 7A). *Hatco III*, 836 F.Supp. at 1074. Given the determination that Hatco substantially complied with the 1985 NCP in undertaking and implementing the PA Response Action, and that the costs incurred were necessary, the Court awards to Hatco full recovery of its response costs totalling $5,004,022.76.

### 2. Project 50

94. Given the determination that Hatco substantially complied with the 1990 NCP in undertaking and implementing Project 50, the Court will award to Hatco recovery of the associated costs in accordance with the apportionment of liability set forth in *Hatco III*.

95. As a preliminary matter, the Court recognizes that a portion of Project 50 in-

---

27. In Appendix 4 of *Hatco III*, the Court totalled the volumes of soil contaminated with PCBs (84,-905), BNs (83,337) and VOCs (77,352.5) (in sum 245,594.5). Hatco's percentage share of this sum comes to 9.5% after totalling its contribution to the volumes of soil contaminated with PCBs (3,261.1), BNs (8,118.1), VOCs (11,972).

volved the investigation and remediation of various lines and segments in the sewer system at the Fords property. In *Hatco III*, the Court did not apportion liability for the remediation of the sewer lines at the site (AEC 22). Hatco believed that imperfections or breaks in the sewer lines were allowing PCBs to enter the system from the surrounding soil. Hatco never confirmed this belief. In fact, the sewer system was essentially in good condition but for a few locations requiring minor repair. Consequently, without evidence that PCBs were leaching into the system from the surrounding soil, the Court is left to assume that the PCBs entered the sewer system via the natural flow and drainage of run-off and surface waters at the site.

96. Therefore, to apportion liability for the sewer system, the Court will consider the type of contaminant found in the system or segment of the system, the surface water access locations along the sewer line (collection boxes, trench drains and manholes) and the contamination in the AEC from which the surface waters drain into the system. Apportionment for sewer contamination will correspond to the apportionment for surface contamination in the implicated AECs.[28]

### a. Replacement of the Ester I and West Road Sewer Lines

97. Surface water entry points along the Ester I sewer line were located in the Ester I complex and Hydrotherm Building areas (AEC 4), the Ester I tank farm area (AEC 9A) and the former ponds area (AEC 2). The contaminated segment of the West Road sewer line collected drainage from the Ester I tank farm area (AEC 9A).

98. The Court found Grace fully responsible for the PCB surface contamination in the areas of the former ponds, the Hydrotherm Building and the Ester I complex areas. *Hatco III*, 836 F.Supp. at 1069. The Court, however, did assign to Hatco 5.1% of the PCB surface contamination in the Ester I tank farm area. *Id.* at 1071–72.

99. Hatco incurred total costs of $599,-623.67 for the replacement of the Ester I line and the segment of the West Road line. The Court concludes that Hatco is responsible for 5.1% of the portion of these costs associated with the replacement of the segment of the West Road sewer line, contamination of which has been linked to drainage from the Ester I tank farm area.

100. The Court will assign the balance of the $599,623.67 in costs to Grace. The Court recognizes that the small percentage of PCB surface contamination in the Ester I tank farm area, which has been assigned to Hatco, may have contributed to the PCB-contamination in the Ester I sewer line. However, the Court is not in the position, and is without the requisite evidence, to determine relative volumes of drainage intake into the Ester I sewer line from the former ponds, Ester I complex and Ester I tank farm areas. Therefore, lacking the means for apportionment, the Court finds that it is reasonable for Grace to bear those costs associated with the contamination and replacement of the Ester I sewer line. *See Alcan,* 964 F.2d at 271 (addressing divisibility of harm, if defendant "cannot prove that the harm is divisible and that the damages are capable of some reasonable apportionment, it will be liable for the full claim").

101. The Court assigns to Hatco the burden of identifying those costs associated with the Ester I line (100% recoverable by Hatco) and those costs associated with the West Road line (94.9% recoverable by Hatco). Without a breakdown of these costs, the Court is unable to allocate Hatco's request for $599,623.67 in accordance with its apportionment scheme.

### b. Television Camera Inspection of the Sewer System

102. The record reveals that the television camera inspection focussed primarily on

---

28. The Court cautions and repeats, that where Hatco has established Grace's liability, Grace may successfully assert the divisible harm defense to avoid liability only by establishing that "the harm in question is capable of *reasonable* apportionment based on the contribution of each party." *Hatco III*, 836 F.Supp. at 1087 (emphasis added) (citing *United States v. Rohm & Haas,* 2 F.3d 1265, 1280 (3d Cir.1993)).

the PA/ZAA and the Ester II lines. Surface water entry points along the Ester II line are located primarily in the M tank area (AEC 9C), with a manhole located near the former ponds area (AEC 2), near the very end of the sewer line. Entry points along the PA/ZAA line are located in the former PA plants area (AEC 6), the Ester I Railroad Siding Area (AEC 3), the Ester I building (AEC 4) and the Ester II building (AEC 5) east of the Ester I Railroad Siding Area.

103. Responsibility for PCB contamination in the M tank area has been assigned to Hatco. *Hatco III*, 836 F.Supp. at 1072. The majority of PCB surface contamination along the entry points to the PA/ZAA sewer line has been assigned to Grace. *Id.*

104. Hatco incurred $14,371.12 in costs for the television camera inspection. Given that the majority of any suspected PCB contamination in the Ester II line would be attributable to Hatco, the Court will not allow Hatco to recover those costs associated with the television camera inspection of the Ester II line. Hatco may recover the balance of costs incurred for the inspection of the PA/ZAA sewer line.

105. The Court assigns to Hatco the burden of identifying those costs associated with the inspection of the PA/ZAA line (100% recoverable by Hatco) and those costs associated with the inspection of the Ester II line (0% recoverable by Hatco). Without a breakdown of these costs, the Court is unable to allocate Hatco's request for $14,371.12 in accordance with its apportionment scheme.

c. **Isolation and Capping of the Lagoons**

106. The Court previously assigned to Grace full responsibility for the PCB contamination above the man-made clay liner in the east and west lagoons (AEC 1). *Hatco II*, at 836 F.Supp. at 1065. Because Hatco introduced to the lagoons materials which mobilized PCBs, allowing migration vertically, Hatco was assigned liability for 26.8% of the PCBs found below the clay liner. *Id.*

107. Hatco incurred costs of $249,446.38 for the installation of capping at the lagoons. The objective was to impede surface water contact with the lagoons and to prevent PCB migration to the sewer system via surface water flow. Given Grace's liability for the PCB surface contamination in the lagoons, the Court finds that Hatco may fully recover these costs.

d. **Diverting Ester II Swale Discharge from the East Lagoon to the EPT Plant**

108. The Court assigned to Grace full responsibility for the PCB contamination in AEC 3, including the Ester II swale area. Hatco incurred costs of $93,977.63 to redirect collected swale away from the east lagoon and into the EPT plant for treatment via the Ester II sewer line. While redirecting the contaminated swale did not remediate the Ester II swale area, this aspect of Project 50 did reduce the migration of PCBs and, in fact, did effect treatment of PCB contamination in the effluent which had been linked to the Ester II swale area. Hatco may recover these costs.

e. **Ester I Tank Farm Construction Projects**

109. Hatco incurred costs of $619,-750.95 [29] to implement the Ester I tank farm construction projects, which were designed to contain and reduce migration of PCBs from the surface soils in the Ester I tank farm area via surface water flow. As noted, this Court assigned to Hatco 5.1% of PCB surface soil contamination in the Ester I tank farm area (AEC 9A). *See Hatco III*, 836 F.Supp. at 1071–72. Therefore, Hatco may recover 94.9% of the costs ($588,143.65) incurred for the Ester I tank farm construction projects.

3. **Project 51**

110. Hatco has expended $71,367.74 during Project 51, which, so far, has been implemented in response to the seepage of PCB-contaminated groundwater near Warehouse

---

29. This figure includes costs incurred for the construction of dike walls in the Ester I tank farm area and containment in the tank truck loading areas. These costs were not included in the Damages Stipulation. *See supra* note 14.

No. 4 and to the detection of PCBs in monitoring Well 15S.

111. The Court determined that Grace, with one exception, would be responsible for PCB contamination in the groundwater at the site. *Hatco III*, 836 F.Supp. at 1076. The one exception was the PCB liquid found in Well 15S, for which the Court assigned full responsibility to Hatco based upon Hatco's use of xylene at the site. *Id.*

112. Accordingly, Hatco may not recover any Project 51 costs which are associated with the PCB contamination in Well 15S. Whether or not the seepage at Warehouse No. 4 may be linked to Hatco's use of xylene or any other materials, the Court is unable to ascertain. In view of the Court's apportionment for PCB contamination in the groundwater, Grace has failed to establish that the seepage near Warehouse No. 4 may be attributed to any activities of Hatco. Therefore, the Court finds that Hatco may recover its response costs for Project 51, but only those costs associated with the seepage near Warehouse No. 4.

113. The Court assigns to Hatco the burden of identifying those costs related to the seepage at Warehouse No. 4 (100% recoverable by Hatco) and those costs associated with PCB remediation in Well 15S (0% recoverable by Hatco). Without a breakdown of these costs, the Court is unable to allocate Hatco's request for $71,367.74 in accordance with its apportionment scheme.

### 4. Groundwater Monitoring: 1982–86

114. Between 1982 and 1986, Hatco incurred costs of $78,426.36 in connection with groundwater monitoring programs implemented by Hatco at the direction of DEP and pursuant to subsequent administrative orders. This early monitoring was instituted at the site based upon the detection of contaminants attributable to Grace's ownership, including toluene, PCBs and naphthalene. Therefore, the Court will assign these early monitoring costs in full to Grace.

### 5. Laboratory Work: 1991–93

115. Before addressing this particular cost recovery request, the Court acknowledges that liability for the PCB contamination in Hatco's effluent and in the EPT plant has not been apportioned. Like the PCB contamination in the sewer system, contamination in the effluent and at the EPT plant may be traced to the drainage of surface waters which carry PCBs from the surface soil into the sewer system. Therefore, the Court will apportion liability based upon the same analysis applicable to the sewer contamination. *See supra* ¶ 96. Given Grace's liability for the majority of PCB contamination at the site, the Court will assign to Grace full responsibility for the PCB contamination in the EPT plant and the effluent.[30]

116. Between January 1991 and August 1993, Hatco incurred $448,188.50 for laboratory work during Projects 50 and 51 and as part of the investigative work performed under ACO II. Hatco requests that Grace be held accountable in full for the $143,399.00 associated with Projects 50 and 51, and that the balance of $344,789.50 be allocated according to the Court's apportionment scheme.

117. The Court is not readily convinced that Hatco should recover in full for the cost of the laboratory work associated with Projects 50 and 51. Given Grace's liability for the PCB contamination in the effluent and the EPT plant, Hatco may recover in full those lab work costs assignable to sampling taken of the effluent or at the EPT plant. However, certain of the PCB lab work appears to have been performed in locations, or on materials, in which Grace has not been assigned full responsibility for PCB contamination.

118. With respect to Project 50, the Court assigned to Hatco responsibility for 5.1% of the PCB surface contamination in the Ester I tank farm area (AEC 9A). Therefore, Hatco may recover from Grace 94.9% of

---

30. As was applicable to the sewer contamination, Grace's liability would also be subject to limitation to the extent Grace could establish a divisibility defense based upon Hatco's contribution of PCBs to the surface soil. In connection with the PCB contamination in the EPT plant and in Hatco's effluent, Grace has not proven that such liability may be apportioned reasonably. *See Alcan*, 964 F.2d at 271; *supra* note 28.

those laboratory costs associated with the testing of surface soil and other materials from the Ester I tank farm area. As to Project 51, Hatco may not recover any lab costs associated with PCB contamination in monitoring Well 15S; liability for which the Court has been assigned fully to Hatco.

119. The Court assigns to Hatco the burden of identifying those Project 50 lab costs associated with Ester I tank farm area (94.9% recoverable by Hatco) and those Project 50 lab costs associated with AECs other than the Ester I tank farm (percentage recoverable equal to percentage of responsibility apportioned to Grace for PCB contamination). As to Project 51 lab costs, Hatco must identify those costs associated with the seepage near Warehouse No. 4 (100% recoverable by Hatco) and those costs associated with PCB remediation in Well 15S (0% recoverable by Hatco). Without a breakdown of these costs, the Court is unable to allocate Hatco's request for $143,399.00 in accordance with its apportionment scheme.

120. As to the $344,789.50 of costs associated with ACO II, the Court utilizes the overall site-wide percentages. Hatco may recover 90.5% of these costs which equals $312,034.90.

## 6. Disposal of PCB–Contaminated Waste

121. Hatco has incurred costs of $904,770.29 for the disposal of EPT plant waste, sludge from Tank 204–208 separation system and other PCB-contaminated materials. Based on the Court's apportionment of liability for PCB contamination, Hatco will not be allowed to recover these costs in full.

122. Given the Court's determination that Grace would be responsible for the PCB contamination in the EPT plant and the effluent, Hatco may recover its total expenditure of $568,725.93 for the disposal of PCB-contaminated EPT plant waste.

123. Given the Court's determination that Hatco would be responsible for 5.1% of the PCB contamination in the Tank 204–208 oil-water separation system (AEC 9A), Hatco may recover 94.9% of its costs ($21,223.44) for the disposal of PCB-contaminated sludge from the tank system.

124. Given the Court's determination that Hatco would be responsible for 5.1% of the PCB contamination in the surface soil of the Ester I tank farm area (AEC 9A), Hatco may recover (a) 94.9% of its cost ($243,964.61) for the disposal of PCB-contaminated materials excavated during the construction activities of Project 50, and (b) 94.9% of its costs ($2,489.23) to cover and store certain of the excavated materials from Project 50 pending acceptance from an offsite disposal facility.

125. Given the Court's determination that Grace would be responsible fully for the PCB contamination in the railroad siding areas (AEC 3), see Hatco III, 836 F.Supp. at 1070–71, Hatco may recover its total expenditure of $27,685.20 for the loading and offsite transport and disposal of PCB-contaminated soil excavated during the repair of the south railroad siding area.

126. Hatco incurred $18,844.50 in expenses for soil testing in connection with construction and excavation in the Ester II railroad siding area (AEC 3). Apportioning responsibility in this area, the Court assigned to Grace 55.8% of the BN contamination and 100% of the PCB contamination. Id. No actionable VOCs have been detected here. Hatco may recover from Grace (a) its total cost of $3,448.54 for PCB testing, (b) 55% of its costs ($4,164.03) for BN testing, and (c) 84.5% of its costs ($2,149.69) for VOC testing (based upon the site-wide percentages for VOC contamination, see Hatco III, 836 F.Supp. at 1088).[31]

127. Given Hatco's liability for the PCB contamination in the Ester II complex (AEC

---

**31.** The Court previously determined that Grace would be jointly and severally liable for metal contamination at the site. Hatco III, 836 F.Supp. at 1089. However, the Court reconsidered this determination and found that Hatco had not made the requisite prima facie showing to establish that Grace should be held responsible for metals contamination at the site. Hatco Corp. v. W.R. Grace & Co.–Conn., 849 F.Supp. 987 (D.N.J.1994) (published decision—motion for reconsideration of Hatco III). Hatco may not recover any costs associated with the remediation of metal contamination.

5) and M tank areas (AEC 9C), *see Hatco III*, 836 F.Supp. at 1070, 1072, Hatco cannot recover the $7,452.20 of expenses incurred for the loading and offsite transport and disposal of PCB-contaminated materials excavated during the upgrade of the Ester II facilities and the construction of the nearby tank farm.

### 7. Cleanup of the M Tanks

128. Based on the Court's determination that Hatco would be responsible for the PCB contamination in the M tank area (AEC 9C), Hatco cannot recover the $484,201.65 of expenses incurred to sample and dispose of the contaminated M tank contents.

### 8. Management Time and Attorneys' Fees

129. In connection with Projects 50 and 51 and the disposal of PCB-contaminated EPT plant waste, Hatco has incurred (a) management time costs in the amount of $4,100.00, and (b) nonlitigation attorneys' fees of $2,446.35 paid to Herold & Haines. Given that the AEC of primary concern in Project 50 was the Ester I tank farm, and that Hatco was apportioned 5.1% of the responsibility for the surface PCB contamination in that area, Hatco may recover only 94.9% of these management costs and attorneys' fees that are associated with Project 50. As to Project 51, if Hatco can definitively establish that these management costs are allocable to the seepage near Warehouse 4, the Court finds them recoverable. Those costs that are, or may be, associated with the oil recovery system in Well 15S must be absorbed by Hatco.

130. Hatco has not identified those management and legal costs attributable to Project 51. Once having identified those costs, Hatco has the burden of identifying those Project 51 management and legal costs associated with the seepage near Warehouse No. 4 (100% recoverable by Hatco) and those costs associated with PCB remediation in Well 15S (0% recoverable by Hatco). Without a breakdown of these costs, the Court is unable to allocate Hatco's request for

$4,100.00 in management costs and $2,446.35 in nonlitigation attorneys' fees in accordance with its apportionment scheme.

131. Hatco has paid $19,826.12 to Lowenstein, Sandler for legal services in connection with ACO II.[32] Based on the overall sitewide percentages, Hatco may recover 90.5% of these fees which amounts to $17,942.64.

### 9. DRAI Fees

132. The Court previously deemed recoverable certain DRAI fees in the amount of $668,975.43. *Hatco III*, 836 F.Supp. at 1086; *Hatco I*, 801 F.Supp. at 1328–29. These fees are subject to allocation. Hatco may recover in full the $28,273.13 paid to DRAI in connection with the investigation of the PA and Naphthalene Disposal Areas (AECs 7A, 14). As to the balance of $640,702.30, the Court will apply the overall site-wide percentages (90.5% to Grace; 9.5% to Hatco), which provides Hatco a recovery of $579,835.58 for the DRAI fees incurred in connection with the NJPDES permit and other non-remediation projects.

133. Hatco also seeks recovery of additional DRAI fees incurred between October 1988 and August 1993. Hatco may recover in full the requested $19,480.48 for DRAI services in connection with the investigation and excavation of the PA Disposal Area (AEC 7A).

134. Applying the overall site-wide percentages, Hatco may recover 90.5% of the additional fees associated with the monitoring program under the NJPDES permit which totals $177,672.44.

135. Given Hatco's percentage of responsibility for the PCB contamination in the Ester I tank farm area (AEC 9A), the Court will allow Hatco to recover 94.9% of DRAI's fees associated with the investigation for and implementation of Project 50 which amounts to $23,390.80. Applying this same percentage to DRAI fees incurred for soil and sludge sampling during Project 50, the Court will allow Hatco to recover $22,538.31.

---

**32.** The Court notes that legal fees incurred during the PA Response Action were included in the total costs recovered for that particular activity. *See supra* ¶ 93.

136. Hatco seeks to recover $43,120.52 for DRAI fees incurred during Project 51. To extent these fees are related only to the seepage near Warehouse No. 4, Hatco may recover these costs in full. The Court assigns to Hatco the burden of identifying those DRAI fees associated with the seepage near Warehouse No. 4 (100% recoverable by Hatco) and those fees associated with the PCB remediation of Well 15S (0% recoverable by Hatco). Without a breakdown of these costs, the Court is unable to allocate Hatco's costs of $43,120.52 in accordance with its apportionment scheme.

137. In connection with ACO II, fees for DRAI services have reached $473,555.99. Applying the overall site-wide percentages, Hatco may recover 90.5% of these fees which equals $428,568.17.

138. Given Grace's full responsibility for PCB contamination in the Ester II railroad siding area (AEC 3), Hatco may recover its expenditure of $2,046.74 for DRAI's fees in connection with the sampling and characterization of soils during the repair of the Ester II railroad siding area.

139. Due to Hatco's full responsibility for the PCB contamination in Well 15S, the Court will not allow Hatco to recover the $17,201.82 incurred for DRAI's maintenance and inspection of the oil recovery system in Well 15S.

140. DRAI fees have also been incurred for review of the draft ACO II ($16,200), work performed pursuant to ACO II ($473,-555.99) and for other ongoing investigatory work ($8,717.91). Applying the overall site-wide percentages, Hatco may recover 90.5% of these fees which amounts to $451,118.87.

141. Having allocated the response costs in accordance with the parties' respective liabilities,[33] the Court points out that, apart from the PA Response Action costs, Hatco's response costs were incurred during PCB-driven activities. The Court is sensitive to the fact that certain of these PCB-related responses may have effectively remediated certain VOC or BN contamination. For ex-

ample, consider the disposal of PCB-contaminated soils and materials from Project 50. In addition to PCBs, widespread BN contamination was found in the Ester I tank farm (AEC 9A). The Court assigned to Hatco responsibility for 42.4% of the BN contamination in this area. By allocating the remediation costs based on PCBs alone, Hatco would seemingly receive a free ride on its BN liability.

142. Nevertheless, the Court has indicated that Grace may reduce its share of PCB-driven response costs by "deducting Hatco's share of the response costs that have or would be incurred in excess of the response cost allocated to PCB removal." *Hatco III*, 836 F.Supp. at 1089 n. 29. Given that PCB contamination will drive the cost of the cleanup, it is unlikely that response costs incurred or to be incurred will provide such a deduction for Grace. Yet, much remediation remains and at this juncture the Court is unwilling to speculate whether circumstances exist that will lend themselves to such deductions in the future. Grace has proffered no evidence that would enable the Court to consider such a deduction now. Moreover, since PCB use and dispersal into the environment by Grace preceded any BN or VOC use and dispersal by Hatco, it is neither unfair nor inequitable that Hatco escapes financially unscathed for the remediation of PCBs allocated solely to Grace, notwithstanding the fact they may be intermingled with other organic chemicals attributable to Hatco. Had Hatco's use and discharge of organic chemicals preceded Grace's use and discharge of PCBs, then perhaps this allocation of financial responsibility would have to be re-examined. Because of the variables that figure in environmental litigation, a case-by-case analysis is essential to an appropriate disposition of the parties' respective financial responsibility.

### D. Prejudgment Interest

143. Under CERCLA, Hatco is entitled to prejudgment interest on its recover-

---

**33.** A summary of the foregoing allocations is attached as Appendix III. There is a discrepancy of $30.66 between the Court's calculation of Hat-

co's requested costs ($10,134,408.81) and the totals set forth in the parties' stipulations ($10,-134,439.47).

able costs as previously established by the Court in *Hatco III*, 836 F.Supp. at 1089–90.

■ 144. Damage awards for contribution under the Spill Act also may be subject to prejudgment interest. With respect to state law claims in federal court, the law of the forum state controls the award of prejudgment interest. *Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401, 1414 (3d Cir.1985). This rule applies even where jurisdiction is based on a federal question. *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1344–45 (1st Cir.1988).

145. The Spill Act does not expressly provide for awards of prejudgment interest. N.J.S.A. 58:10–23.11g. The Court also notes that no court has ever addressed claims for prejudgment interest under the Spill Act. The Court does so today.

■ 146. Principles of equity guide a court in determining whether prejudgment interest should be awarded. *Gilbert v. Durand Glass Mfg. Co.*, 258 N.J.Super. 320, 331, 609 A.2d 517 (App.Div.1992). The purpose for awarding prejudgment interest is to compensate the plaintiff for loss of money earned if payment had not been delayed. *Ellmex Constr. Co. v. Republic Ins. Co.*, 202 N.J.Super. 195, 212–13, 494 A.2d 339 (App.Div. 1985), *certif. denied*, 103 N.J. 453, 511 A.2d 639 (1986).

147. The Court views the equities in this case in favor of an award of prejudgment interest. Hatco has expended millions of dollars during the past ten years to remediate the environmental contamination at the Fords property, for which Grace has been assigned all or most of the liability. Despite Hatco's invitations for Grace to become involved in site remediation, Grace rebuffed such entreaties and consciously chose to travel the litigation route. Therefore, the Court will grant an award of prejudgment interest in accordance with New Jersey Civil Practice Rule 4:42–11(b).[34]

■ 148. Given the identity of the damage award under Hatco's CERCLA and Spill Act claims, the Court will allow Hatco only one full recovery. To this end, "in collecting the fruits of [its] victory, [Hatco is] concededly entitled to only a single slice of the pie— but the choice of the slice [is Hatco's]." *Freeman v. Package Machinery Company*, 865 F.2d 1331, 1345 (1st Cir.1988) (addressing damage and interest awards for parallel federal and state age discrimination claims). As a result, Hatco is entitled to prejudgment interest under either CERCLA or New Jersey law, but not both.[35]

### E. Punitive Damages

■ 149. Private litigants cannot recover punitive damages under CERCLA. *Regan v. Cherry Corp.*, 706 F.Supp. 145, 151 (D.R.I.1989).

150. The Court understands that DEP recently authorized Hatco to pursue treble damages under the Spill Act. *See* N.J.S.A. 58:10–23.11f(a)(3). Because the Court has been advised that Grace will appeal DEP's authorization in the New Jersey courts, the Court will withhold consideration on Hatco's treble damage claim until the matter has been exhausted at the state level.

### III. RETAINING JURISDICTION

151. Because delineation of the contamination at the site is ongoing, the Court con-

---

**34.** Rule 4:42–11(b) expressly provides for prejudgment interest in tort actions only. The rule may apply to other types of claims in accordance with principles of equity. *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 478–79, 541 A.2d 1063 (1988). Rule 4:43–11 provides that the annual rate of interest shall equal the average rate of return, to the nearest whole or one-half percent for the corresponding preceding fiscal year terminated on June 30, of the State of New Jersey Cash Management Fund (state accounts) as reported by the Division of Investment in the Department of Treasury. R. 4:42(a)(ii) (incorporated by reference in R. 4:42(b)). The rates for the relevant time period are as follows: 6.0% for 1988; 7.0% for 1989; 8.0% for 1990; 8.5% for 1991; 7.5% for 1992; and 5.5% for 1993. Current N.J. Civil Practice Rules, publisher's note on R.4:42–11 (West 1994).

**35.** In its proposed findings of fact, Hatco submitted interest calculations on the total response costs sought in this action. Under CERCLA rates, the interest totalled $2,469,022.46. Under the New Jersey rates, the interest totalled $2,920,253.33. Hatco's calculations, of course, would be affected by the Court's allocation of costs. How they would be affected, the Court is unable to determine. Accordingly, the Court will expect the parties to address this question in the settlement of a proposed judgment.

tinues to retain jurisdiction to monitor adjustments in the volumes of contaminated soil and ultimately, after the risk assessment and the remediation plan have been devised, approved by the state and implemented, to determine the parties' respective shares of additional response costs.

152. With respect to certain of Hatco's response costs, the record has not facilitated allocation of specific dollar amounts. *See supra* ¶¶ 101, 105, 113, 119, 129, 136. In these instances, the Court will require Hatco to submit affidavits, certifications or other documentation identifying the specific dollar amounts recoverable in conformity with the Court's allocations above. These submissions must accompany the parties' proposed Judgment, or the Court will deny Hatco its recoverable share of these unallocated costs.

153. The parties shall jointly submit a Judgment in conformity with this Opinion within thirty (30) days of the date hereof.

### APPENDIX I—NONTESTIFYING WITNESSES [1]

1. **George Chryss** has been the Executive Vice President and Chief Operating Officer of Hatco from June 1985 to the present.

2. **William Grassmyer** was Hatco Corporation's Plant Manager from August 1986 to

---

1. In this Opinion, the Court cites to the testimony of testifying and nontestifying witnesses in

May 1988. The Environmental Manager from May 1988 to December 1988, the Special Projects Manager from December 1988 to June 1992, and the plant Safety Manager from June 1992 to the present.

3. **Kevin Koch** is an associate of Killam Associates, Inc., which provided engineering and construction oversight services for work performed in Project 50.

4. **James Millikin** has been Hatco's Environmental Manager from August 1991 to the present.

5. **Prasad Narayana** has been an environmental engineer at Hatco from 1989 to the present and has been responsible for keeping records of environmental testing at the site.

6. **Dan Raviv** is the President of Dan Raviv Associates, Inc.

7. **Anthony Reitano** is a Director in the law firm of Herold and Haines, a professional association.

8. **Michael Rodburg** is a Director in the law firm of Lowenstein, Sandler, Kohl, Fischer & Boylan, a professional association.

9. **John Trela** is the Senior Consultant and Technical Director for Dan Raviv Associates, Inc.

*Hatco III. See* 836 F.Supp. at 1053–54, 1094–95.

APPENDIX II

APPENDIX III

Appendix III

| RESPONSE ACTIVITY | AECs INVOLVED | MAJOR CONTAMINANT | ALLOCABLE RESPONSE COSTS ($) | UNALLOCABLE RESPONSE COSTS ($) | ALLOCATION GRACE | ALLOCATION HATCO | RECOVERABLE COSTS |
|---|---|---|---|---|---|---|---|
| **PROJECT 50** | | | | | | | |
| Ester I Sewer Line Replacement | 7A | BN | 5,004,022.76 | | 100.0% | 0.0% | 5,004,022.76 |
| West Road Sewer Line Replacement | 2,4,9A | PCB | *** | 659,623.67 | 100.0% | 0.0% | *** |
| Isolating and Capping Lagoons | 9A | PCB | | | 94.9% | 5.1% | *** |
| T.V. Camera Inspection – PA/ZA/A Line | 1 | PCB | 249,446.38 | | 100.0% | 0.0% | 249,446.38 |
| T.V. Camera Inspection – Ester II Line | 3,4,5,6 | PCB | *** | 14,371.12 | 100.0% | 0.0% | *** |
| Redirecting Ester II Swale | 9C | PCB | 93,977.63 | | 0.0% | 100.0% | 0.00 |
| Ester I Tank Farm Construction Projects | 3 | PCB | 93,977.63 | | 100.0% | 0.0% | 93,977.63 |
| | 9A | PCB | 619,750.95 | | 94.9% | 5.1% | 588,143.65 |
| **PROJECT 51** | | | | | | | |
| Seepage Near Warehouse No 4 | groundwater | PCB | *** | 71,357.74 | 100.0% | 0.0% | *** |
| PCB Remediation in Well 15S | groundwater | PCB | *** | | 0.0% | 100.0% | 0.00 |
| **GROUNDWATER MONITORING 1982-86** | groundwater | PCB | 78,426.36 | | 100.0% | 0.0% | 78,426.36 |
| **LABORATORY WORK 1991-93** | | | | | | | |
| Project 50 – Ester I Tank Fa m Area | 9A | PCB | *** | 143,395.00 | 94.9% | 5.1% | *** |
| Project 50 – Other Areas | 1-6 | PCB | *** | | 100.0% | 0.0% | *** |
| Project 51 – Warehouse No 4 | groundwater | PCB | | | 100.0% | 0.0% | *** |
| Project 51 – Well 15S | groundwater | PCB | | | 0.0% | 100.0% | 0.00 |
| ACO II | site-wide | PCB, BN, VOC | 344,789.50 | | 90.5% | 9.5% | 312,034.90 |
| **PCB WASTE DISPOSAL** | | | | | | | |
| EPT Plant and Effluent | 22 | PCB | 568,725.93 | | 100.0% | 0.0% | 568,725.93 |
| Ester I Tank Farm Sludge | 9A | PCB | 22,364.00 | | 94.9% | 5.1% | 21,223.44 |
| Project 50 – Ester I Tank Farm Construction | 9A | PCB | 259,698.46 | | 94.9% | 5.1% | 246,453.84 |
| South Railroad Siding Repair | 3 | PCB | 27,685.20 | | 100.0% | 0.0% | 27,685.20 |
| Ester II Railroad Siding Area – Materials Testing | 3 | PCB | 3,448.54 | | 100.0% | 0.0% | 3,448.54 |
| Ester II Railroad Siding Area – Materials Testing | 3 | BN | 7,452.42 | | 55.8% | 44.2% | 4,164.03 |
| Ester II Railroad Siding Area – Materials Testing | 3 | VOC | 2,544.01 | | 84.5% | 15.5% | 2,149.69 |
| Ester II Railroad Siding Area – Materials Testing | 3 | Metals | 5,389.53 | | 55.8% | 44.2% | 3,007.36 |
| Ester II Railroad Siding Area – Tie Testing | 3 | Metals | 600.00 | | 55.8% | 44.2% | 334.80 |
| Upgrading of M Tank and Ester II Areas | 5,9C | PCB | 7,452.20 | | 0.0% | 100.0% | 0.00 |
| M Tank Cleanup | 9C | PCB | 484,201.95 | | 0.0% | 100.0% | 0.00 |
| **MANAGEMENT TIME AND ATTORNEYS' FEES** | | | | | | | |
| Project 50 | 1-6, 9A | PCB | *** | 6,546.35 | 100.0% | 0.0% | *** |
| Project 51 – Warehouse No 4 | groundwater | PCB | *** | | 100.0% | 0.0% | *** |
| Project 51 – Well 15S | groundwater | PCB | | | 0.0% | 100.0% | 0.00 |
| ACO II | site-wide | PCB, BN, VOC | 19,826.12 | | 90.5% | 9.5% | 17,942.64 |
| **DRAI** | | | | | | | |
| PA Response Action – previously allowed | 7A | BN | 28,273.13 | | 100.0% | 0.0% | 28,273.13 |
| NJPDES Permit – previously allowed | site-wide | PCB, BN, VOC | 640,702.30 | | 90.5% | 9.5% | 579,835.58 |
| PA Response Action | 7A | BN | 19,480.48 | | 100.0% | 0.0% | 19,480.48 |
| NJPDES Permit | site-wide | PCB, BN, VOC | 195,323.14 | | 90.5% | 9.5% | 177,672.44 |
| Project 50 – Investigation and Implementation | 1-6 9A | PCB | 29,916.55 | | 94.9% | 5.1% | 28,390.81 |
| Project 50 – Sludge and soil characterization | 1-6 9A | PCB | 23,749.77 | | 94.9% | 5.1% | 22,538.31 |
| Project 51 – Well 15S | groundwater | PCB | *** | 43,120.52 | 0.0% | 100.0% | 0.00 |
| Ester II Railroad Siding Area | groundwater | PCB | 2,046.74 | | 100.0% | 0.0% | 2,046.74 |
| Well 15S | groundwater | PCB | 17,201.82 | | 0.0% | 100.0% | 0.00 |
| ACO II | site-wide | PCB, BN, VOC | 498,474.54 | | 90.5% | 9.5% | 451,118.87 |
| **TOTALS** | | | 9,255,980.41 | 878,426.40 | | | 8,525,543.50 |

*** Costs subject to allocation and recovery upon submission of requisite proof by Hatco.

## SUPPLEMENTAL OPINION

This matter is raised by the Court *suà sponte* in order to supplement its Opinion dated March 1, 1994, and amended April 29, 1994 (the "Allocation Opinion"). Given the length of the Allocation Opinion and the re-lated Opinion that preceded it, *Hatco Corp. v. W.R. Grace & Co.—Conn.,* 836 F.Supp. 1049 (D.N.J.1993) (the "Apportionment Opinion"), the Court will address only those matters outstanding when the Allocation Opinion was issued.[1]

1. Certain terms defined in the Apportionment and Allocation Opinions are incorporated and utilized here without reference.

In the Allocation Opinion, the Court divided between plaintiff Hatco and defendant Grace costs previously incurred by Hatco to remediate the environmental contamination at the Fords facility and property. The Court allocated certain of these response costs between the parties in accordance with the percentage schemes set forth in the Apportionment Opinion or contemporaneously formulated in the Allocation Opinion.

However, the Court found other of the requested response costs unallocable due to certain missing facts which hindered efforts to employ the relevant percentage scheme. Thus, where such allocation problems arose, the Court directed Hatco to submit the requisite information. *See* Allocation Opinion, Conclusions of Law ("COL") ¶¶ 101, 105, 113, 119, 129, 136, 152. Absent compliance with this directive, Hatco would be denied recovery of any of these unallocated costs.

To this end, the parties reached agreement on the unallocated costs and submitted to the Court a Supplemental Stipulation Concerning Damages. The Court adopts the stipulated costs and allocations as follows.

## 1. Replacement of Ester I and West Road Sewer Lines

Hatco incurred costs of $244,428.62 to replace the Ester I sewer line. Grace is fully responsible for these response costs. *See* Allocation Opinion, COL ¶ 101. Hatco also incurred costs of $337,585.17 for the replacement of the contaminated segment of the West Road sewer line. Grace is responsible for 94.9% of these costs. *See id.* Hatco may recover $320,368.32.

## 2. Television Camera Inspection—PA/ZAA and Ester II Sewer Lines

Hatco expended $7,013.05 to inspect the Ester II sewer line by television camera. Hatco is fully responsible for these costs and may not recover any portion of them. *See* Allocation Opinion, COL ¶ 105. Hatco also incurred costs of $7,358.07 to inspect the PA/ZAA sewer line by television camera.

Grace is fully responsible for these costs. *See id.*

## 3. Laboratory Work 1991–93

During the years 1991 through 1993, Hatco incurred costs associated with the laboratory analyses of soil and groundwater samples taken from various locations at the Fords property. The costs incurred and the allocations are as follows:

(a) $43,301.00 spent for the analysis of samples taken from the Ester I tank farm area during Project 50. Grace is responsible for 94.9% of these costs. *See* Allocation Opinion, COL ¶ 118. Hatco may recover $41,092.65;

(b) $94,752.00 expended for the analysis of samples taken for PCB testing in the effluent and sewer lines. Grace is fully responsible for these costs. *See id.* at COL ¶¶ 100, 115;

(c) $816.00 spent for the analysis of samples taken from the Ester II area. Hatco is fully responsible for these costs and may not recover any portion of them. *See Hatco*, 836 F.Supp. at 1069–70; and

(d) $4,530.00 spent for the analysis of samples taken during Project 51. None of these costs were associated with the remediation of Well 15S, thus, Grace is fully responsible for these costs. *See* Allocation Opinion, COL ¶ 118.

## 4. Project 51

Hatco incurred the following additional costs in connection with Project 51: (a) $71,367.74 to remediate the contamination near Warehouse No. 4 and (b) $43,120.52 in fees paid to DRAI for investigatory work. None of these costs were associated with the remediation of Well 15S, and therefore, Hatco may recover them in full. *See* Allocation Opinion, COL ¶¶ 112–13.

## 5. Management Time and Attorneys' Fees

Hatco also incurred expenses for management time and attorneys fees in connection with certain of the remediation projects. The costs incurred and the allocations are as follows:

(a) \$2,967.50 incurred on Project 50. Grace is responsible for 94.9% of these costs. *See* Allocation Opinion, COL ¶ 129. Hatco may recover \$2,816.16;

(b) \$2,241.10 incurred on Project 51. Grace is fully responsible for these costs. *See id.* at COL ¶ 130; and

(c) \$1,337.75 incurred in connection with the PCB contamination in the effluent and sewer system. Grace is fully responsible for these costs. *See id.* at COL ¶¶ 110, 115.

**2.** The attached Supplemental Appendix essentially supersedes Appendix III of the Allocation Opinion, given the inclusion of the allocations set forth above.

**3.** The Court points out that this figure differs from the total response costs set forth in the Allocation Opinion (\$10,134,439.47). *See* Allocation Opinion, Findings of Fact ("FOF") ¶ 193 & n. 13, Appendix III. The discrepancy stems from calculation adjustments and the withdrawal or modification of certain response costs. These adjustments, which have been incorporated and set off in the Supplemental Appendix, are explained below (figures prior to adjustment are noted parenthetically).

Hatco does not seek to recover the response costs of \$57,859.83 included in the Grassmyer and Koch Stipulations. *See* Allocation Opinion, FOF ¶¶ 193–94 nn. 13–14, COL ¶ 109 & n. 29. Thus, Hatco incurred costs of \$561,891.12 (\$619,750.95) to implement the Ester I tank farm construction projects. Hatco may recover \$533,234.67 (\$588,143.65) of these costs. *See id.* at COL ¶ 109.

In addition, the Court recognizes the following modifications:

(a) Hatco incurred, and may recover in full, costs of \$5,004,011.76 (\$5,004,022.76) for the clean up the PA Disposal Area. *See* Allocation Opinion, FOF ¶ 194, COL ¶ 93;

(b) Hatco spent \$582,013.79 (\$599,623.67) to construct the above-ground sewer line and remove from service the Ester I line and a segment of the West Road line. *See id.* at FOF ¶ 195(a), COL ¶¶ 99–100. The allocation of these costs is set forth above;

## CONCLUSION

The attached Supplemental Appendix reflects the total of Hatco's requested and recoverable response costs, including the foregoing allocations.[2] Hatco sought recovery of \$10,019,367.46,[3] of which \$9,269,892.41 has been deemed recoverable. With pre-judgment interest (\$2,919,885.75) included, Hatco's total recovery from Grace equals \$12,189,778.16.

An appropriate Order and Judgment is attached.

(c) Hatco incurred costs of \$1,559,559.87 (\$1,577,169.75) to implement Project 50 tasks. *See id.* at FOF ¶ 195;

(d) Hatco incurred DRAI fees of \$196,324.14 (\$196,323.14) for services rendered in connection with groundwater sampling under the NJPDES Permit. Thus, Hatco may recover \$177,673.75 (\$177,672.44) of these costs. *See id.* at FOF ¶ 225(c), COL ¶ 134;

(e) Hatco incurred DRAI fees of \$9,156.31 (\$8,717.91) for ongoing investigatory projects. Consequently, Hatco has incurred DRAI fees of \$498,912.90 (\$498,474.54), of which it may recover \$451,516.27 (\$451,118.87). *See id.* at FOF ¶ 225(1), COL ¶ 140;

(f) Hatco incurred costs of \$304,789.50 (\$344,789.50) for laboratory work performed during the years 1991–93 under ACO II, of which it may recover \$275,834.50 (\$312,034.90). *See id.* at COL ¶¶ 116, 120. Hatco's total requested costs for laboratory work during 1991–93 equals \$408,188.50 (\$448,188.50). *See id.* at FOF ¶ 198, COL ¶ 116;

(g) Hatco may recover DRAI fees of (i) \$28,390.81 (\$23,390.80) incurred in connection with investigation for and implementation of Project 50, and (ii) \$22,538.53 (\$22,538.31) for sludge and soil characterization during Project 50. *See id.* at COL ¶ 135; and

(i) Hatco has incurred costs of \$5,989.53 to remediate metals contamination at the site. Hatco has not established that Grace should be responsible for remediation of metals at the site and thus may recover \$0.00 (\$3,342.16) of these costs. *See Hatco Corp. v. W.R. Grace & Co.–Conn.*, No. 89–1031 (D.N.J. April 29, 1994) (published decision—motion for reconsideration of Apportionment Opinion).

Supplemental Appendix

| RESPONSE ACTIVITY | AECs INVOLVED | MAJOR CONTAMINANT | ALLOCABLE RESPONSE COSTS ($) | ALLOCATION (%) GRACE | ALLOCATION (%) HATCO | COSTS ALLOCATED TO GRACE ($) | COSTS ALLOCATED TO HATCO ($) |
|---|---|---|---|---|---|---|---|
| PA RESPONSE ACTION | 7A | BN | +5,004,011.76 | 100.0% | 0.0% | 5,004,011.76 | 0.00 |
| **PROJECT 50** | | | | | | | |
| Ester I Sewer Line Replacement | 2, 4, 9A | PCB | ^244,428.62 | 100.0% | 0.0% | 244,428.62 | 0.00 |
| West Road Sewer Line Replacement | 9A | PCB | ^337,585.17 | 94.9% | 5.1% | 320,368.32 | 17,216.85 |
| Isolating and Capping Lagoons | 1 | PCB | 249,446.38 | 100.0% | 0.0% | 249,446.38 | 0.00 |
| TV Camera Inspection – PAZAA Line | 3, 4, 5, 6 | PCB | ^7,356.07 | 100.0% | 0.0% | 7,356.07 | 0.00 |
| TV Camera Inspection – Ester II Line | 9C | PCB | 7,013.05 | 0.0% | 100.0% | 0.00 | 7,013.05 |
| Redirecting Ester II Swale | 3 | PCB | 93,977.63 | 100.0% | 0.0% | 93,977.63 | 0.00 |
| Ester I Tank Farm Construction Projects | 9A | PCB | +561,891.12 | 94.9% | 5.1% | 533,234.67 | 28,656.45 |
| **PROJECT 51** | | | | | | | |
| Seepage Near Warehouse No 4 | groundwater | PCB | ^71,367.74 | 100.0% | 0.0% | 71,367.74 | 0.00 |
| **GROUNDWATER MONITORING 1982-86** | groundwater | PCB | 78,426.36 | 100.0% | 0.0% | 78,426.35 | 0.00 |
| **LABORATORY WORK 1991-93** | | | | | | | |
| Project 50 – Ester I Tank Farm Area | 9A | PCB | ^43,301.00 | 94.9% | 5.1% | 41,092.65 | 2,208.35 |
| Project 50 – Other Areas | 1 – 6 | PCB | ^94,752.00 | 100.0% | 0.0% | 94,752.00 | 0.00 |
| Project 50 – Ester II Area | groundwater | PCB | ^816.00 | 0.0% | 100.0% | 0.00 | 816.00 |
| Project 51 – Warehouse No 4 | groundwater | PCB | ^4,530.00 | 100.0% | 0.0% | 4,530.00 | 0.00 |
| ACO II | site-wide | PCB, BN, VOC | +304,789.50 | 90.5% | 9.5% | 275,834.50 | 28,955.00 |
| **PCB WASTE DISPOSAL** | | | | | | | |
| EPT Plant and Effluent | 22 | PCB | 568,725.93 | 100.0% | 0.0% | 568,725.93 | 0.00 |
| Ester I Tank Farm Sludge | 9A | PCB | 22,364.00 | 94.9% | 5.1% | 21,223.44 | 1,140.56 |
| Project 50 – Ester I Tank Farm Construction | 9A | PCB | 259,698.46 | 94.9% | 5.1% | 246,453.84 | 13,244.62 |
| South Railroad Siding Repair | 3 | PCB | 27,685.20 | 100.0% | 0.0% | 27,685.20 | 0.00 |
| Ester II Railroad Siding Area – Materials Testing | 3 | PCB | 3,448.54 | 100.0% | 0.0% | 3,448.54 | 0.00 |
| Ester II Railroad Siding Area – Materials Testing | 3 | BN | 7,462.42 | 55.8% | 44.2% | 4,164.03 | 3,298.39 |
| Ester II Railroad Siding Area – Materials Testing | 3 | VOC | 2,544.01 | 84.5% | 15.5% | 2,149.69 | 394.32 |
| Ester II Railroad Siding Area – Materials Testing | 3 | Metals | 5,389.53 | 0.0% | 100.0% | 0.00 | 5,389.53 |
| Ester II Railroad Siding Area – Tie Testing | 3 | Metals | 600.00 | 0.0% | 100.0% | 0.00 | 600.00 |
| Upgrading of M Tank and Ester II Areas | 5, 9C | PCB | 7,452.20 | 0.0% | 100.0% | 0.00 | 7,452.20 |
| M Tank Cleanup | 9C | PCB | 484,201.95 | 0.0% | 100.0% | 0.00 | 484,201.95 |
| **MANAGEMENT TIME AND ATTORNEYS FEES** | | | | | | | |
| Project 50 | 1 – 6, 9A | PCB | ^2,867.50 | 94.9% | 5.1% | 2,716.16 | 151.34 |
| Project 51 – Warehouse No 4 | groundwater | PCB | ^2,241.10 | 100.0% | 0.0% | 2,241.10 | 0.00 |
| PCB Contamination – Effluent/EPT | site-wide | PCB | ^1,337.75 | 100.0% | 0.0% | 1,337.75 | 0.00 |
| ACO II | site-wide | PCB, BN, VOC | 19,826.12 | 90.5% | 9.5% | 17,942.64 | 1,883.48 |
| **DRAI** | | | | | | | |
| PA Response Action – previously allowed | 7A | BN | 28,273.13 | 100.0% | 0.0% | 28,273.13 | 0.00 |
| NJPDES Permit – previously allowed | site-wide | PCB, BN, VOC | 640,702.30 | 90.5% | 9.5% | 579,835.58 | 60,866.72 |
| PA Response Action | 7A | BN | 19,480.48 | 100.0% | 0.0% | 19,480.48 | 0.00 |
| NJPDES Permit | site-wide | PCB, BN, VOC | ^196,324.14 | 90.5% | 9.5% | 177,673.34 | 18,650.80 |
| Project 50 – investigation and implementation | 1 – 6, 9A | PCB | 29,916.55 | 94.9% | 5.1% | 28,390.80 | 1,525.75 |
| Project 50 – sludge and soil characterization | 1 – 6, 9A | PCB | 23,749.77 | 94.9% | 5.1% | 22,538.53 | 1,211.24 |
| Project 51 – Warehouse No 4 | groundwater | PCB | ^43,120.52 | 100.0% | 0.0% | 43,120.52 | 0.00 |
| Ester II Railroad Siding Area | 3 | PCB | 2,046.74 | 100.0% | 0.0% | 2,046.74 | 0.00 |
| Well 1SS | groundwater | PCB | 17,201.82 | 0.0% | 100.0% | 0.00 | 17,201.82 |
| ACO II | site-wide | PCB, BN, VOC | ^498,912.90 | 90.5% | 9.5% | 451,516.27 | 47,396.63 |
| **TOTALS** | | | 10,019,367.41 | | | 9,269,892.41 | 749,475.05 |

^ Costs previously unallocable in Allocation Opinion.    + Adjusted cost figures.

## ORDER & JUDGMENT

This action came on for trial before this Court concerning plaintiff Hatco Corporation's claim and defendant and third-party plaintiff W.R. Grace & Co.–Conn.'s counterclaim under the Comprehensive Environmental Response, Compensation and Liability Act, and concerning Hatco's claim for contribution under the New Jersey Spill Compensation and Control Act, all of those claims seeking allocation of the costs already incurred and to be incurred in the future to investigate and clean up contamination of the property at the Fords facility at issue in this action, and the issues having been duly tried and a decision on these issues having been duly rendered,

It is on this 29th day of April, 1994,

ORDERED, ADJUDGED and DE-CREED that:

1. For the reasons stated in the Court's Opinions of July 27, 1992, October 4, 1993, March 1, 1994 and April 29, 1994, the Court's Memorandum and Order of May 13, 1993, and the Court's Order of November 1, 1993, plaintiff Hatco Corporation shall recover from defendant W.R. Grace & Co.–Conn. the sum of Nine Million, Two Hundred Sixty–Nine Thousand, Eight Hundred Ninety–Two Dollars and Forty–One Cents ($9,269,892.41), plus prejudgment interest in the amount of Two Million, Nine Hundred Nineteen Thousand, Eight Hundred Eighty–Five Dollars and Seventy–Five Cents ($2,919,885.75), and plaintiff's costs in this action;

2. It is expressly determined that, as the resolution of the remaining claims between the parties may take several years, there is no just reason for delay in the entry of a final judgment;

3. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure the Clerk of the Court shall enter final judgment on Hatco Corporation's claim and W.R. Grace & Co.–Conn.'s counterclaim under the Comprehensive Environmental Response, Compensation and Liability Act, and Hatco Corporation's claim under the New Jersey Spill Compensation and Control Act, in the amount of Twelve Million, One Hundred Eighty–Nine Thousand, Seven Hundred Seventy–Eight Dollars and Sixteen Cents ($12,189,778.16), against W.R. Grace & Co.–Conn. and in favor of Hatco Corporation for costs already incurred to investigate and clean up contamination of the property at the Fords facility.